# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**DANIEL W. PHOENIX,**

      **Plaintiff,**

    **v.**　　　　　　　　　　　　　　　　**Civil Action No. 3:23cv276**

**HAROLD CLARKE,** *et al.,*

      **Defendants.**

## MEMORANDUM OPINION

    Daniel W. Phoenix,[1] a former Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[2]  Phoenix contends that Defendants[3] denied him adequate

---

    [1] Phoenix changed his name from Daniel Jamison to Daniel Phoenix during the course of this litigation.

    [2] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

    [3] By Memorandum Opinion and Order entered on January 21, 2025, the Court dismissed the claims against the administrative Defendants: Defendants Clarke, Amonette, Herrick, Miller, Oates, and, J. Harris.  (ECF Nos. 69, 70.)  Only the medical Defendants remain:  Defendants Dr. Henceroth, J. Schnur, Dr. Alvin Harris, Dr. Sharma, Advanced Practice Registered Nurse ("APRN") Marinos, and Nurse Powell ("Medical Defendants").  Although the Medical Defendants are represented by the same counsel, due to problems with service, the Medical Defendants have filed two separate dispositive motions.  On June 26, 2025, Defendants Henceroth and J. Schnur filed a Motion for Summary Judgment that is now before the Court for review ("First Motion for Summary Judgment").  (ECF No. 88.)  On October 21, 2025, Defendants Dr. Alvin Harris, Sharma, Marinos, and Powell filed a Motion for Summary Judgment (ECF No. 104), that will be addressed later, in a different opinion ("Second Motion for Summary Judgment").  The Court corrects the spelling of the Medical Defendants' names.

medical care with respect to an elbow and shoulder injury while he was incarcerated in the Deerfield Correctional Center ("DCC"). The matter is before the Court on the Second Particularized Complaint (ECF No. 23), and the Motion for Summary Judgment (ECF No. 88) filed by Defendants Dr. Henceroth and Nurse Schnur ("First Motion for Summary Judgment"). The Court provided Phoenix with notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). (ECF No. 91.) Phoenix filed a Response. (ECF No. 96.) Because Phoenix received an extensive amount of medical care and simply disagreed with the timing and course of the care, the First Motion for Summary Judgment will be GRANTED.

## I. Procedural History and Remaining Claim

As the Court noted in the January 21, 2025 Memorandum Opinion, Phoenix fails to set forth one clear set of claims for relief in his Second Particularized Complaint. Instead, he has sections entitled, "CIVIL RIGHTS VIOLATED AND THE DEFENDANTS ALLEGEDLY RESPONSIBLE" (ECF No. 23, at 13–16), "LEGAL THEORIES OF THIS COMPLAINT" (ECF No. 23, at 16–17), and then finally, "COUNTS AND CLAIMS OF THIS COMPLAINT" (ECF No. 23, at 17–19).[4] Reading the document liberally, the Court construed Phoenix to raise the following claims for relief.

> Claim One: Defendants Clarke, Amonette, and Herrick "were and remain deliberately indifferent to Phoenix's serious elbow and shoulder injuries for failing to provide the necessary corrections to his medical care once they were notified he was not receiving the proper medical care" in violation of the Eighth Amendment.[5] (ECF No. 23, at 17.)

> Claim Two: Defendants Miller, Oates, and Operations Harris "were and remain deliberately indifferent to Phoenix's serious medical shoulder and elbow

---

[4] The Court employs the pagination assigned by the CM/ECF docketing system. The Court corrects the capitalization, spelling, and punctuation and omits emphasis in the quotations to the parties' submissions.

[5] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

2

conditions for failing to provide the necessary corrections to his medical care, failing to provide timely access to medical testing and untimely access to surgical remedies once notified" through grievances and letters in violation of the Eighth Amendment. (ECF No. 23, at 18.)

Claim Three: Defendants Dr. Harris, Dr. Friend, Dr. Sharma, Dr. Henceroth, APRN Marinos, RN Schnur, and RN Powell "are and remain deliberately indifferent to my serious medical shoulder and elbow conditions through their actions of not providing timely access to medical testing, timely access to surgical corrections, and failing to provide the proper standard of medical care" in violation of the Eighth Amendment. (ECF No. 23, at 18.)

Phoenix seeks a large sum of monetary damages as relief. (ECF No. 23, at 19–20.) By Memorandum Opinion and Order entered on January 21, 2025, the Court dismissed Claims One and Two. Accordingly, only Claim Three remains pending before the Court.

The Court observes that the First Motion for Summary Judgment filed by Defendants Henceroth and Schnur is fully briefed and is ripe for disposition.[6] Nevertheless, in response to the Second Motion for Summary Judgment filed by Defendants Dr. Alvin Harris, Sharma, Marinos, and Powell, that is not currently before the Court, Phoenix filed a host of motions. Out of abundance of caution, the Court addresses those motions in this opinion. As is his practice, Phoenix has disregarded the rules and the directives of the Court in these motions and in his Response. As discussed below, in Part III, prior to turning to the merits of the First Motion for Summary Judgment, the Court denies Phoenix's motions. The Court perceives Phoenix's recent motions as filed in bad faith, to harass Defendants, and as an attempt to stall his many cases that have been pending on the Court's docket for two and a half years. The Court addresses the motions along with his Response in Opposition to the First Motion for Summary Judgment.

---

[6] Phoenix filed his Response to the First Motion for Summary Judgment on August 14, 2025, and at that time, filed no motions related to discovery, a need for a stay, or counsel.

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448).

In support of the First Motion for Summary Judgment, Defendants Henceroth and Schnur submit: Phoenix's medical records (ECF No. 89-1); the declaration of Defendant Dr. Henceroth

(ECF No. 89-2), who attests that the attached medical records are true and correct; and, the
declaration of Defendant Jessica Schnur R.N. (ECF No. 89-3).

### III.  Phoenix's Response in Opposition and Later Filed Motions

As discussed previously, the First Motion for Summary Judgment is fully briefed and has
been so since August 2025.  Nevertheless, the Court addresses the recent motions filed by
Phoenix in this opinion out of abundance of caution.  Phoenix filed (1) his Response (ECF
No. 96); (2) a Motion to Appoint Counsel (ECF No. 115); (3) a Motion to Stay (ECF No. 116);
and, (4) Motion for Discovery and Issuance of Subpoenas (ECF No. 118).  As explained below,
Phoenix again has misrepresented the facts, ignored the relevant rules governing his submissions,
and specifically disregarded the directives of the Court.  *See, e.g., Jamison v. Clark*,
No. 3:22CV425, 2024 WL 251927, at *1 (E.D. Va. Jan. 23, 2024) ("*Jamison I*") (finding that
Phoenix "disregarded the Court's orders, provided knowingly false information, and realleged
claims against defendants that previously had been dismissed with prejudice by the United States
District Court for the Western District of Virginia ('Western District'))," *aff'd sub nom. Jamison
v. Dotson*, No. 24-6132, 2024 WL 3220310 (4th Cir. June 28, 2024).  Because of this, the Court
will limit its consideration of some of the material submitted by Phoenix.

### A.  Phoenix Regularly Ignores Court Rules and Orders

The Court's evaluation of Phoenix's current conduct does not occur in a vacuum.  *See
Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (explaining that a court may
review other court records); *Clay v. Yates*, 809 F. Supp. 417, 427–28 (E.D. Va. 1992) ("[I]t is
appropriate to consider what the court's records show about the number and kinds of cases
instituted by the *pro se* litigant, and the extent to which the conduct of that litigant constitutes
and an abuse of the judicial process." (citations omitted)).  Two years ago, the Court observed
that although Phoenix is appearing *pro se*, "he is a sophisticated litigant."  *Jamison I*, 2024 WL

251927, at *7.  The Court observed that, "Jamison has an expansive history of unnecessarily protracting litigation by improper complaints and ignoring the Court's directions."  *Id.* at *8. The Court found that Phoenix's "conduct in the present action alone stands as a testament to his inclination to ignore the Federal Rules of Civil Procedure, the Court's orders, and to proceed in manner of his own choosing." *Id.*  As explained below, in the present action, Phoenix continues to exhibit this behavior,

Since the filing of *Jamison I*, Phoenix has filed more than fifteen additional actions in this Court. *See id.* (citing cases); *Phoenix v. Dotson*, 3:24CV625 (E.D. Va. Nov. 21, 2024). Therefore, when the Court conditionally filed the present action, the Court informed Phoenix that, "[e]ach submission must bear the appropriate civil action number for the case to which it pertains." (ECF No. 3 ¶ 8.)  The Court further warned Phoenix that he could not submit a single response or motion listing multiple cases.  (ECF No. 3 ¶ 8.)[7]  As discussed below, Phoenix simply disregarded that directive.

### B. Phoenix's Submissions Listing Multiple Cases

Phoenix has submitted a Motion to Stay, Motion for Discovery and Issuance of Subpoenas, and a Motion for Appointment of Counsel that bear the civil action number for the present action, 3:23cv276,[8] and for 3:23cv316, 3:23cv335, 3:23cv357, and 3:23cv615.  (ECF No. 115, at 1; ECF No. 116, at 1; ECF No. 118, at 1.)  He has submitted a copy of these motions for each of his cases.  Once again, Phoenix has chosen to ignore the Court's orders and proceed

---

[7] The Court warned Phoenix that if he "attempts to submit one response [or motion] listing a group of case numbers, the Court will only docket that submission in the first-listed civil action on that submission. The Court will not consider the submission as a response in any other civil action."  (ECF No. 3 ¶ 8.)

[8] Phoenix transposed the numbers for this case, as "3:23cv267."  He does not have a case with that case number.

in his preferred manner. The motions contain information that is inaccurate and irrelevant to this present action. Phoenix's disregard of the Court's directives regarding filing individualized motions for each separate civil action provides sufficient grounds for denying each of the motions. Accordingly, the motions (ECF Nos. 115, 116, 118) will be DENIED on that basis alone. Nevertheless, in this instance, the Court will provide a further individualized discussion of each motion below and the Court's reasons for denying that motion.[9]

In his Motion to Stay, Phoenix requests that the Court stay further proceedings in this matter pending the resolution of his Motion for Discovery and Motion for Appointment of Counsel. (ECF No. 117, at 1.)

In his Motion for Discovery and Issuance of Subpoenas, Phoenix states that, "[i]n each case, the Court has denied Phoenix discovery and production of requested documents. The Defendants have further denied and not proffered critical documents they are obligated to provide under the Court's Rules for Discovery despite several requests from the plaintiff." (ECF No. 119 ¶ 3.) Phoenix then indicates that he has received copies of his medical records, but claims that they are incomplete, somehow. (ECF No. 119 ¶¶ 7, 8.) In his Memorandum in Support of his Motion to Stay, Phoenix references this present action and states, "[n]o discovery has been allowed for the plaintiff." (ECF No. 117, at 3.) The Court's review of the lengthy docket in this matter reveals that Phoenix filed no motion pertaining to discovery until the just-filed Motion for Discovery and Issuance of Subpoenas. As discovery is to be conducted on an informal basis, it was incumbent on Phoenix to seek discovery from Defendants on his own. In

---

[9] In the future, with respect to the identical motions filed in Phoenix's other cases, the Court may, if appropriate, refer to this case and summarily deny the motions.

fact, the record reflects that Phoenix did just that. The Medical Defendants[10] responded to Phoenix's discovery requests on July 30, August 14, and August 15. (ECF No. 114, at 2–3; *see generally* ECF No. 114-1 through 114-4.) Phoenix's discovery requests were overbroad and were not at all tailored to the distinct facts in this case. (ECF No. 114-1.) Phoenix does not appear to have pursued additional discovery from the Medical Defendants in this case.

### C. Motion for Discovery and Issuance of Subpoenas

In *pro se* prisoner cases, such as this, "there is no prohibition on the immediate availability of discovery upon the commencement of the case." *Smith v. Rollins*, No. 3:16CV293-HEH, 2019 WL 13418468, at *1 (E.D. Va. Jan. 29, 2019) (quoting *Awan v. U.S. Dep't of Justice*, No. 101100 (BAH), 2011 WL 2836555, at *1 (D.D.C. July 13, 2011)). Phoenix has had an unfettered opportunity to conduct discovery in this action and in his many other actions challenging his medical care and has taken advantage of many opportunities. Phoenix fails to articulate any basis, limited to the particulars of this action, explaining why an order from the Court pertaining to discovery is necessary. Further, with respect to his vague request for issuance of subpoenas, Phoenix fails to clearly identify to whom he wishes the subpoenas be issued and what documents he requires.[11] Accordingly, Phoenix's Motion for Discovery and Issuance of Subpoenas (ECF No. 118) will be DENIED.

---

[10] For the purposes of Part III, the Court refers to all of the remaining medical Defendants, including Defendants Henceroth and Schnur, as "Medical Defendants." *See supra* p.1 n.1.

[11] The pertinent Local Rule states: "Parties appearing *pro se* may apply for subpoenas in their own behalf. All such requests by such party must be accompanied by a memorandum setting forth the names and addresses of witnesses or the documents requested and why and for what purpose or purposes." E.D. Va. Loc. Civ. R. 45(A).

### D. <u>Motion to Stay</u>

"[S]ummary judgment should only be granted 'after adequate time for discovery.'"

*McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 483 (4th Cir.

2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). As noted above, Phoenix

has had ample time to conduct discovery. Moreover, Phoenix did not file these motions in

conjunction with his Response to the First Motion for Summary Judgment filed in August of

2025 that is currently before the Court. Nevertheless, "when a party lacks material facts

necessary to combat a summary judgment motion, [the party] may file an 'affidavit or

declaration that, for specified reasons, [the party] cannot present facts essential to justify its

opposition.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 56(d)). "The threshold

showing to support a Rule 56(d) motion is low." *Escobar-Salmeron v. Moyer*, 150 F.4th 360,

369 (4th Cir. 2025). Nevertheless, the party seeking a stay pursuant to Fed. R. Civ. P. 56(d),

must "specifically allege why the information sought would [be] sufficient to create a genuine

issue of material fact such that it [could] defeat[] summary judgment." *Strag v. Bd. of Trustees*,

55 F.3d 943, 954 (4th Cir. 1995). Mere "[v]ague assertions" that more discovery is needed are

insufficient to warrant a stay or the denial of a motion for summary judgment. *Escobar-*

*Salmeron*, 150 F.4th at 372 (alteration in original) (quoting *Nguyen v. CNA Corp.*, 44 F.3d 234,

242 (4th Cir. 1995)).

Here, Phoenix has not identified any specific information that he needs in discovery,

much less explained how such information would be sufficient to defeat the Motions for

Summary Judgment filed in this case. Instead, Phoenix initially misrepresented the truth and

stated, "[n]o discovery has been allowed for the plaintiff." (ECF No. 117, at 3.) Later, Phoenix

simply discusses how the Court incorrectly dismissed the administrative Defendants from this

action, but that was long before he requested discovery from the remaining Medical Defendants.

9

(ECF No. 117, at 7.)  Phoenix once again claims that "the court denied all discovery in this matter and went to right to summary judgment motions."  (ECF No. 117, at 8.)

Given the thousands of pages of medical records and grievances the Medical Defendants provided to Phoenix (*see* ECF No. 89-1; ECF No. 105-1),[12] and that Phoenix has filed with the Court (ECF No. 96-2 through 96-8; ECF No. 111-1 through 111-3), and the fact that the Medical Defendants responded to his discovery requests, his vague allegations that the discovery was incomplete is not sufficient to stay summary judgment.  Phoenix has had ample time to alert the Court and the Medical Defendants to a specific document that is missing or that was not provided and he has not done so.   Further, Phoenix fails to articulate with specificity the content of any omitted document that would demonstrate any of the Medical Defendants turned a blind eye to his need for medical care.  Rather than a legitimate attempt to delay summary judgment while Phoenix pursues evidence in support of his claims, the Motion for a Stay is an improper attempt to delay the proceedings with false and unsubstantiated allegations.  Accordingly, the Motion for a Stay (ECF No. 116) will be DENIED.

### E. Motion for Appointment of Counsel

The United States Court of Appeals for the Fourth Circuit has stated,

> that a district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel. [*Whisenant v. Yuam*, 739 F.2d 160, 162 (4th Cir. 1984)].  That inquiry requires the court to determine (1) whether the plaintiff "has a colorable claim" and (2) considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff "lacks the capacity to present it."  *Id.*  If both questions are answered affirmatively, the case presents exceptional circumstances. *Id.*

---

[12] Indeed, the bates number for the final medical record submitted with the Motion for Summary Judgment is 1541, and in another batch filed with the Court the number is 1652. (ECF No. 89-1, at 40; ECF No. 105-1, at 75.)  Clearly, the Medical Defendants have provided Phoenix with a vast number of documents in response to his pending litigation.

*Jenkins v. Woodard*, 109 F.4th 242, 247 (4th Cir. 2024). Phoenix has presented colorable claims, so the analysis of his Motion for Appointment of Counsel focuses on considering his claims' objective complexity and Phoenix's subjective abilities, whether he lacks the capacity to present the claims. The claims in the present action are not particularly complex—they involve Phoenix's injury to his elbow and shoulder and the adequacy of the care to treat the injuries. Phoenix's submissions reflect that he is more than competent to litigate those claims. Therefore, the appointment of counsel is not necessary. Further, as he did in his prior motions, Phoenix insists that he has been denied the opportunity to conduct discovery. (*See* ECF No. 115, at 17.) As discussed previously, that is simply not true.

Therefore, in closing, the Court notes that "the assistance of a pro bono lawyer in civil litigation is a privilege." *Cartwright v. Silver Cross Hosp.*, 962 F.3d 933, 937 (7th Cir. 2020) (citing *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007)). "The valuable help of volunteer lawyers is a limited resource. It need not and should not be squandered on parties" whose very request for counsel reflects a lack of candor regarding the need for appointing counsel. *Dupree v. Hardy*, 859 F.3d 458, 462–63 (7th Cir. 2017). The Motion for Appointment of Counsel (ECF No. 115) will be DENIED.

### F. **Phoenix's Response and Declaration**

At this stage, the Court is tasked with assessing whether Phoenix "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Although Phoenix filed a Response to the First Motion for Summary Judgment (ECF No. 96), it fails to comply with the rules governing such responses. As a preliminary matter, the Court understands that Phoenix is *pro*

*se*; however, he is no longer incarcerated and therefore no longer faces the same impediments he did as a prisoner. Moreover, Phoenix's submissions demonstrate that he is a sophisticated litigant. Although Phoenix's *pro se* status makes him "entitled to some deference," it does not relieve him of his duty to abide by the rules and orders of this Court. *Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989) (citation omitted). Over the course of the nineteen lawsuits filed in this division, the Court has had to constantly remind Phoenix of his obligation to follow the instructions provided by the Court and the rules of the Court. Phoenix has consistently disregarded the Court's orders. *See, e.g.*, *Jamison v. Clark*, No. 3:22cv425, 2024 WL 251927, at *7–11 (E.D. Va. Jan. 23, 2024) (discussing Phoenix's "expansive history of unnecessarily protracting litigation . . . and ignoring the Court's directions" and the consequences of his repeated failure to comply with the Court's orders).

In order to ensure that the parties shoulder their respective burdens for a motion for summary judgment, Local Rule 56(B) requires that:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and *citing the parts of the record relied on to support the facts alleged to be in dispute*. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added). In Phoenix's Response, he fails to include a specifically captioned section listing "the relevant parts of the record relied on to support the facts alleged to be in dispute." *Id.* Therefore, the Court can assume the remainder of facts

identified by Defendants Henceroth and Schnur in their list of material facts are admitted. E.D. Va. Loc. Civ. R. 56(B).[13]

Phoenix attached to his Response 756 pages of medical records, grievance material, correspondence, and other information. (ECF No. 96-1 through 96-8.) Phoenix, however, fails to provide any useful citation to individual documents. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). Rather, "[t]he court need consider only the cited materials . . . ." Fed. R. Civ. P. 56(c)(3); *see Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (alterations in original) (observing that "[j]udges are not like pigs, hunting for truffles buried [in the record]" (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010))). Thus, these materials are of little use in deciding the propriety of summary judgment.

Finally, Phoenix's Response is rambling, repetitive, and because of that, is unnecessarily lengthy. Phoenix also includes information unrelated to the allegations in the Particularized Complaint. For example, Phoenix contends that "defendants . . . fail[ed] to make the corrections to his care and give further rise to their alleged deliberate indifference to [Phoenix's] serious and diagnosed neck and back medical conditions that lasted over 5 years." (ECF No. 96, at 6)[14]

---

[13] Even in his section identified as, "STATEMENT OF UNDISPUTED MATERIAL FACTS," Phoenix repeatedly adds information that is not in evidence or an undisputed fact, such as "RN Schnur also took an interest in denying [Phoenix] pain management while implementing no other options." (ECF No. 96, at 7.)

The Court also notes that Phoenix's Response is 47 pages, which is 17 pages longer than the Local Rules permit. E.D. Va. Local Civil R. 7(F)(3). Nevertheless, the Court will consider the Response where appropriate despite Phoenix's clear disregard of the rules.

[14] Phoenix has filed so many suits against the same defendants that it is likely difficult for him to keep them straight. The Court notes that, in addition to his complaints about his elbow and shoulder, simultaneously, Phoenix complained incessantly to many of the same defendants about his hearing loss and tinnitus, his neck and back pain, an ankle injury after a fall off a van,

Phoenix also adds stray remarks that suggest new theories of liability, such as claiming that Defendants Henceroth and Schnur are liable on a theory of supervisory liability (which makes no sense in this context as neither are supervisors) and drops asides that sound in negligence, such as assertions that Defendants Henceroth and Schur failed to "provide diligent care" and that they were not reasonably prudent. (*See, e.g.*, ECF No. 96, at 30.) However, Phoenix may not add new claims or allegations in a responsive brief. *See Hurst v. Dist. of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017) (observing that "a plaintiff may not amend her complaint via briefing") (citing *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 847 F. Supp. 2d 843, 851 n.9 (E.D. Va. 2012); *Equity in Athletics. Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007) (citations omitted) (explaining that "new legal theories must be added by way of amended pleadings, not by arguments asserted in legal briefs"). To the extent Phoenix attempts to bring new claims, they will receive no further consideration here.

---

celiac disease, other food sensitivities, pulmonary and breathing issues. *See, e.g., Phoenix v. Clarke*, No. 3:23cv276, 2026 WL 21754, at *2 n.4 (E.D. Va. Jan. 5, 2026) (citations omitted); *Phoenix v. Vital Core Health Strategies*, No. 23cv357, 2025 WL 2313208, at *3 (E.D. Va. Aug. 11, 2025) (explaining that between 2019 and 2024, Phoenix complained about "celiac disease, a torn bicep tendon, neck and back injuries, hearing issues, breathing issues, dental problems and other ailments" and "was seen scores of times for these medical issues"); *Phoenix v. Herrick*, No. 3:23cv335 (E.D. Va. filed May 18, 2023) (suing over fall from transport van and treatment for ankle injury). In one lawsuit alone filed in this division, Phoenix claimed that he had "celiac disease, inguinal hernia, umbilical hernia, serious neck and back pain with nerve pain, hemorrhoids, pain management, dermatitis hepiformas, foot problems, malnutrition, tinnitus in ears, dental erosion, and mental problems," as well as peripheral neuropathy and paresthesis. *Jamison v. Northam*, No. 3:20cv339 (E.D. Va. May 13, 2020), ECF No. 1, at 8, 14 (spelling and capitalization corrected).

Between August 2019 and 2024, Phoenix filed at least nineteen lawsuits in this division alone challenging various aspects of his medical care that have required the Court to expend a great deal of time and resources to resolve. Phoenix has filed vexatious and repetitive lawsuits against numerous Virginia Department of Corrections ("VDOC") employees, medical providers, and even attorneys for the Commonwealth charged with defending the actions, for every alleged ailment simply because he was dissatisfied with the level and type of care he received.

Phoenix attached his own Declaration to his Response. (ECF No. 96-1.) The facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, the sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

In his Declaration, Phoenix makes numerous sworn statements that are of no value in assessing the propriety of summary judgment. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks omitted) (citations omitted) ("[a]iry generalities, conclusory assertions[,] and hearsay statements [do] not suffice to stave off summary judgment"). As a preliminary matter, Phoenix's Declaration begins with the following: "[A]ll statements are correct and true based on medical records and grievances and beliefs in this case under the penalty of perjury before this court." (ECF No. 96-1, at 2.)[15] Phoenix's "beliefs" are not evidence. Phoenix is not a medical professional and is not competent to provide a medical opinion about his elbow or shoulder nor are his personal views of any evidentiary value. Fed. R. Civ. P. 56(c)(4); *see Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (holding that prisoner "wholly lacking in medical knowledge" may not give expert medical testimony).[16] Such

---

[15] The inconsistent numbering of the paragraphs of Phoenix's Declaration also makes it difficult to provide pinpoint citations. It appears that, in part, it is a continuation of the numbering in his Statement of Undisputed Material Facts listed in his Response. (*See* ECF No. 96, at 27; ECF No. 96-1.) The Court uses the ECF page numbers for citations to the Declaration.

[16] For example, Phoenix suggests that the "injury occurred due to [staff] ignoring the problem" (ECF No. 96-1, at 12), or that "Dr. Henceroth continued to do nothing despite 4 years of continued pain and mobility that caused the humeral subluxation" (ECF No. 96-1, at 12), or that "the MRI revealed the torn labrum which could have been discovered back in 2020 had

statements will not be considered.  The Declaration also contains hearsay statements, repeating

what medical professionals purportedly told Phoenix for the truth of the matter asserted.  To the

extent this information is not contained in the verified medical records, it will not be considered.

The Declaration also contains generalities, speculation, conclusory statements, and vague

references to "Defendants."  For example, Phoenix swears:

> Despite constant pain and mobility issues and numbness, it took 1.5 years to correct the injury for my elbow, and it took 5 years to correct my shoulder due to the reckless disregard for my health and safety.
> The defendants' actions caused further injury in my shoulder by not providing proper testing and cancelling the ordered testing in my shoulder which led to the need for a replacement shoulder and loss of my natural shoulder.  Also led to my perimeter disability.
> . . . .
> Dr. Henceroth diagnosed the injuries without proper imaging he would have known I needed based on his education and skill which led to delays and improper care at all turns in this issue.  Actual injuries occurred due to his reckless treatment of my arm or lack of treatment and testing.
> The defendants make several perjurious statements in their declaration and their motion for summary judgment which need to be held accountable.

(ECF No. 96-1, at 18 (paragraph numbers and emphasis omitted).)  Such conclusory assertions

and assumptions are of no value in determining whether summary judgment is appropriate.  *See*

*Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (explaining that a nonmoving party cannot

"create a genuine issue of material fact through mere speculation" (citation omitted)); *Grieveson*

*v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) ("Vague references to a group of 'defendants,'

without specific allegations tying the individual defendants to the alleged unconstitutional

---

Dr. Henceroth not canceled the MRI."  (ECF No. 96-1, at 12.)  At best, statements such as these are nothing more than speculation and conjecture.  Moreover, Phoenix is not competent to provide medical assessments.  *See Pearson*, 237 F.3d at 886.

conduct, do not raise a genuine issue of material fact with respect to those defendants." (citation omitted)).[17]

Phoenix has also filed a Motion to Strike the Motions for Summary Judgment. (ECF No. 126.) Phoenix insists that the declarations filed by several Medical Defendants contained perjured testimony. (ECF No. 126, at 2.) However, the Motion to Strike is nothing more than an even more obstreperous attempt to delay the proceedings and will be DENIED.

In light of the foregoing submissions and principles, the following facts are established for the First Motion for Summary Judgment. All permissible inferences are drawn in favor of Phoenix.

### IV.  Summary of Relevant Facts

As a preliminary matter, the Court notes that the record in this action is lengthy. Accordingly, the Court attempts to limit the facts related to Phoenix's claims against Dr. Henceroth and Nurse Schnur here. The medical record is generally not contested by Phoenix. Rather, Phoenix simply believes that Dr. Henceroth and Nurse Schnur failed to prescribe the exact treatment or order additional testing that he desired at the time he wanted it. Despite Phoenix's apparent dissatisfaction with the prescribed treatment, however, the record reflects that Phoenix clearly received constitutionally adequate medical care for his elbow and shoulder.

#### A.  Initial Injury and Appointments with Prison Staff

On December 9, 2020, Phoenix saw Dr. Friend, a prison physician, in his pod for left elbow pain that he had been experiencing for "a while," and for back pain. (ECF No. 89-1, at 5;

---

[17] Phoenix's Particularized Complaint is not sworn to under penalty of perjury. Rather, the only thing that in his Particularized Complaint that he swore to under penalty of perjury was to his certificate of service. (ECF No. 23, at 21.) Phoenix's Declaration is sworn to under penalty of perjury, but as discussed above in Part III.F, it contains many statements that are of no value in assessing the propriety of summary judgment.

ECF No. 89-2 ¶ 11; ECF No. 96-1, at 2.)[18] Phoenix could not recall any specific injury except that he heard something "pop" in his left arm while working out. (ECF No. 89-2 ¶ 11.) Phoenix also wanted to know why his colonoscopy had been cancelled, and Dr. Friend directed the referral department to research this matter. (ECF No. 89-1, at 5.) Dr. Friend examined Phoenix, noted that he exhibited tenderness of the left elbow, but had a full range of motion, and did not complain of any pain in his shoulder. (ECF No. 89-2 ¶ 11.) Dr. Friend suspected that Phoenix had tendonitis and prescribed Phoenix ibuprofen. (ECF No. 89-2 ¶ 11.) Dr. Friend also prescribed other medications for spasms. (ECF No. 89-1, at 5.)

On December 24, 2020, Phoenix saw the nurse at sick call because he was having increased pain and issues with mobility. (ECF No. 96-1, at 3.) Phoenix indicated that he hurt himself while working out, and that he was having trouble moving his left arm and it caused shooting pain in his arm. (ECF No. 89-2 ¶ 12.) Phoenix was instructed to follow up with the doctor and was prescribed 400 mg of ibuprofen for his pain. (ECF No. 89-2 ¶ 12.)

On January 8, 2021, Phoenix saw Dr. Alvin Harris, a primary care prison physician, and Phoenix informed him that he had injured his left elbow while working out. (ECF No. 89-2 ¶ 13.) Phoenix indicated that he was having problems flexing and extending his left elbow, and that he had been icing it and taking Motrin.[19] (ECF No. 89-2 ¶ 13.) Dr. Harris advised Phoenix not to exercise for two weeks, to continue taking Motrin, and to remain under observation. (ECF No. 89-2 ¶ 13.)

On February 3, 2021, Phoenix was seen at nurse sick call for "elbow pain and shoulder pain." (ECF No. 96-1, at 3.) The medical record shows that Phoenix told the nurse that he

---

[18] The Court omits the secondary citations to the medical record.

[19] The medical staff use Motrin and ibuprofen interchangeably in their notes.

18

injured his left arm while doing push-ups, and that he was taking Motrin for the left elbow pain, but that it did not relieve his discomfort. (ECF No. 89-2 ¶ 14.) On February 20, 2021, Phoenix saw Dr. Harris for his chronic care visit and Phoenix noted that he had elbow pain amongst his many other ailments. (ECF No. 96-1, at 3.)

On May 20, 2021, Phoenix demanded to be seen by medical and so he "flipped [a] table." (ECF No 89-1, at 8.) Phoenix presented to the medical department reporting that "something snapped working out of yard this morning," with regard to his left arm. (ECF No. 89-2 ¶ 15; ECF No. 89-1, at 8.) As further explanation, Phoenix indicated that "he was pumping weights (35 lbs) with his [left] arm using a dumbbell when he popped something." (ECF No. 89-1, at 8.) Phoenix complained that he could not straighten or flex his arm due to pain. (ECF No. 89-1, at 8.) Dr. Harris ordered ibuprofen and an x-ray. (ECF No. 89-1, at 8; ECF No. 89-2 ¶ 15.) The x-ray reading indicated: "No acute fracture of malalignment on this single view. Normal bone mineralization. No focal soft tissue abnormality." (ECF No. 89-2 ¶ 15.) Dr. Harris placed an "urgent" referral for Phoenix to see "orthopedic surgery." (ECF No. 89-2 ¶ 15.)

## B. Phoenix's Initial Referral to Dr. Henceroth

The next day, on May 21, and upon Dr. Harris's referral, Phoenix was seen by Dr. William Henceroth, a general orthopedic surgeon who was in private practice, but also provided orthopedic care and treatment to prisoners upon referral from primary care doctors in the prison. (ECF No. 89-2 ¶ 1.) Dr. Henceroth explains:

> For incarcerated patients such as Plaintiff, I would make treatment recommendations to be reviewed and implemented in the prison, but I could not issue orders. The actual ability to carry out the treatment recommendations, as well as the timing and manner in which these recommendations were carried out, were made in collaboration with prison primary care providers.

19

(ECF No. 89-2 ¶ 3.)  Dr. Henceroth treated Phoenix for a variety of orthopedic complaints and issues, not limited to the complaints in this lawsuit.  (ECF No. 89-2 ¶ 8.)[20]

During his first appointment with Phoenix, on May 21, 2021, Dr. Henceroth diagnosed Phoenix with a sprain of the left shoulder and elbow.  (ECF No. 89-2 ¶ 16.)  Dr. Henceroth made recommendations to Phoenix's primary care physicians that Phoenix should continue taking Tylenol and Motrin, ice the area, and that Phoenix should refrain from working.  (ECF No. 89-2 ¶ 16.)  Dr. Henceroth ordered no further imaging at that time.  (ECF No. 96-1, at 4.)

Phoenix saw Dr. Harris again on May 27, 2021, for elbow and shoulder pain.  (ECF No. 89-1, at 7.)  Dr. Harris noted that Phoenix was having numbness in his left arm and shoulder and that he was wearing a sling.  (ECF No. 89-1, at 7.)  Dr. Harris referred Phoenix back to Dr. Henceroth.  (ECF No. 89-1, at 7.)

Phoenix saw Dr. Henceroth on June 2, 2021, for a follow-up appointment.  (ECF No. 89-2 ¶ 17.)  Because Phoenix's symptoms had not improved with the initial conservative treatment that Dr. Henceroth prescribed, Dr. Henceroth determined that additional measures needed to be taken.  (ECF No. 89-2 ¶ 17.)  Dr. Henceroth recommended that Phoenix continue to use a sling and to have an MRI of his left shoulder and left elbow to rule out a rupture of his left biceps tendon.  (ECF No. 89-2 ¶ 17.)

### C. Phoenix's Appointments with an Outside Specialist

The following day, June 3, 2021, Phoenix saw an outside orthopedic surgeon, Dr. Vince Dalton, at Ortho Virginia, for "[p]ain of the [l]eft [s]houlder."  (ECF No. 89-1, at 27.)  Dr.

---

[20] Simultaneously, Phoenix received treatment for a has a host of health issues, excluding his multi-faceted orthopedic treatment, including, "anxiety, asthma, celiac disease, GERD, Barrett's esophagus, several food allergies, dermatitis, high blood pressure, an enlarged prostate, irritable bowel syndrome, obesity, chronic headaches, hearing loss, hemorrhoids, depression, diabetes, pro-traumatic stress disorder, and Sjogren's disease."  (ECF No. 89-2 ¶ 9.)

Dalton noted that Phoenix indicated that "he also felt a pop in the elbow recently while lifting weights a couple of weeks ago." (ECF No. 89-1, at 27.) Dr. Dalton noted that it was a "[v]ery difficult exam. Patient seems to be having pain out of proportion to clinical findings. Seems to have full range of motion of the elbow, but resists motion." (ECF No. 89-1, at 27.) Dr. Dalton could "not rule out a partial tear" of the biceps tendon despite it being palpable, so he ordered an "MRI elbow left without contrast," and provided Phoenix with a referral for an MRI for his left elbow only and not for his shoulder. (ECF No. 89-1, at 27–28.) In his "Plan," Dr. Dalton again noted that Phoenix had a "confusing history," and that "[h]is pain is out of proportion," and that his "elbow appears to be the major source of his pain today," despite being referred for his shoulder. (ECF No. 89-1, at 28.) Dr. Dalton noted that Phoenix was "wearing a left arm sling for assistance." (ECF No. 89-1, at 27.)

### D. Scheduling the MRI

On June 16, 2021, Phoenix saw Dr. Henceroth and he noted that he needed to check on the status of the referral for an MRI. (ECF No. 89-2 ¶¶ 19, 23.) Dr. Henceroth inquired and learned that Dr. Harris had placed the order for an MRI that day. (ECF No. 89-2 ¶ 19.)[21] Dr. Henceroth did not see Phoenix again until September 30, 2021. (ECF No. 89-2 ¶ 23.) Phoenix was scheduled for an MRI of the left elbow on June 30, 2021, but that appointment had to be rescheduled because Phoenix had a conflicting court date. (ECF No. 89-2 ¶ 20.) Phoenix had several additional medical appointments with prison medical staff in June and July 2021. (ECF No. 96-1, at 5.) On August 3, 2021, Dr. Sharma again ordered an MRI of Phoenix's elbow. (ECF No. 96-1, at 5.) Nurse Schnur was present at an appointment where it was noted that a

---

[21] Phoenix argues that Dr. Henceroth "cancels the MRI for the shoulder despite pain and numbness," and "[t]his is where the shoulder is forgotten." (ECF No. 96-1, at 5.) However, the record reflects that the outside orthopedic specialist only ordered an MRI of the left elbow. (ECF No. 89-1, at 28.)

request for an MRI was made on June 16, but that according to Phoenix, "there is not one in notes until Dr. Sharma put the [request] in." (ECF No. 96-1, at 6.) The MRI was rescheduled for August 30, 2021, and Phoenix had an MRI on that date that showed a partial biceps tear. (ECF No. 89-2 ¶ 21; ECF No. 89-1, 39–40.)

### E. **Phoenix's Follow-up Appointments with Dr. Henceroth**

On September 14, 2021, Dr. K. Sharma, a prison primary care physician, referred Phoenix for a follow-up with Dr. Henceroth. (ECF No. 89-2 ¶ 22.) Dr. Henceroth saw Phoenix on September 30, 2021. (ECF No. 89-2 ¶ 23.) Dr. Henceroth provided Phoenix with an elbow sleeve and advised him to follow up as needed. (ECF No. 89-3 ¶ 23.) Dr. Henceroth "did not believe that further intervention was necessary at that time, and concluded, based on [his] medical education, training and experience as an orthopedic surgeon, that Phoenix's condition at that time could be adequately managed with conservative treatment." (ECF No. 89-2 ¶ 23.)

On October 1, 2021, Dr. Sharma "review[ed] the medical file as part of an administrative meeting with RN Schnur present" and the doctor noted that he ordered a sleeve for Phoenix, but "[n]o pain management is ordered and no further orders regarding the shoulder."[22] (ECF No. 96-1, at 6.) On November 5, 2021, Phoenix saw Dr. Sharma, with Nurse Schnur present, he noted "the left arm pain," offered no pain management, and referred Phoenix to Dr. Henceroth. (ECF No. 96-1, at 6.)

Dr. Henceroth "was not involved further with [Phoenix] until December 1, 2021," when he was referred back to him for complaints of posterior elbow pain. (ECF No. 89-2 ¶ 24.) After a physical examination, Dr. Henceroth recommended that Phoenix should continue the

---

[22] Phoenix often fails to differentiate between his elbow and shoulder, and then other times simply refers to his arm or arm pain. This makes it difficult for the Court to assess his specific complaint at that time.

conservative management of the partial biceps tear and remain under observation. (ECF No. 89-2 ¶ 24.) Dr. Henceroth was not involved in Phoenix's care again until November 9, 2022. (ECF No. 89-2 ¶ 28.)

### F. Phoenix's Second Referral to Ortho Virginia

In April of 2022, Dr. Harris referred Phoenix back to Ortho Virginia because Phoenix reported that he had not seen improvement with conservative management, so he was referred for potential surgery. (ECF No. 89-2 ¶ 25.) On April 15, 2022, Phoenix saw a physician's assistant ("PA") at Ortho Virginia for pain in his left elbow. (ECF No. 89-1, at 30.) The PA discussed treatments with Phoenix for the partial tear of the biceps tendon, "including conservative vs. surgical management." (ECF No. 89-1, at 31.) The PA noted that because "he has not seen relief with conservative management, [Phoenix] would like to proceed with surgical intervention," and noted that Phoenix should follow up with the surgeon. (ECF No. 89-1, at 31.) Phoenix was also diagnosed with olecranon bursitis of the left elbow and the PA "recommended minimizing weight bearing on the elbow and the effusion should resolve." (ECF No. 89-1, at 31.) On April 28, 2022, Phoenix had surgery for left biceps repair, was referred for physical therapy, and had his first therapy appointment on May 26, 2022. (ECF No. 89-1 at 34–35.) Phoenix had at least four follow-up appointments with VCU Orthopedics and Ortho Virginia after his surgery. (ECF No. 96-1, at 8–9.)

### G. Phoenix's Final Referrals to Dr. Henceroth for Shoulder Pain

Phoenix was not referred to Dr. Henceroth again from December 1, 2021, until November 9, 2022. (ECF No. 89-2 ¶¶ 24, 28.) On November 9, 2022, Dr. Henceroth saw Phoenix for complaints of shoulder pain and intermittent numbness of his thumb and index finger. (ECF No. 89-1, at 36; ECF No. 89-2 ¶ 28.) Phoenix showed no neurological defects when Dr. Henceroth conducted a physical examination, Dr. Henceroth believed that conservative

treatment was appropriate, and he recommended that Phoenix remain under observation and to see how he would progress with non-invasive treatment. (ECF No. 89-2 ¶ 28.)[23]

Dr. Henceroth had no further involvement in Phoenix's medical care for his shoulder, until Phoenix was referred to him for his left shoulder pain on October 16, 2023.[24] (ECF No. 89-2 ¶ 29.) Based on Phoenix's complaints and a physical exam, Dr. Henceroth referred Phoenix for x-ray imaging of his shoulder and a referral for a physical therapy evaluation. (ECF No. 89-2 ¶ 29.) Dr. Henceroth requested that Phoenix follow-up with him in approximately one month. (ECF No. 89-2 ¶ 29.) However, despite the recommendation that Phoenix follow-up, Dr. Henceroth had no further interactions with Phoenix after October 16, 2023. (ECF No. 89-2 ¶ 31.)[25]

Dr. Henceroth avers that he

disagree[s] with Plaintiff's assertions that there was a delay in receiving medical care, and [he] maintain[s] that all treatment recommendations [he] made for him

---

[23] It is evident from Phoenix's Particularized Complaint that he was attending physical therapy during the time and had twenty-eight appointments between May 24, 2022, and September 27, 2023, and "his elbow improve[d]" but he continued to report numbness and pain to the therapists. (ECF No. 23 ¶ 21.)

[24] Dr. Henceroth explains that Phoenix was referred to him for another orthopedic issue unrelated to this lawsuit prior to October 16. (ECF No. 89-2, at 7 n.1.)

[25] The Court notes that after Phoenix's final appointment with Dr. Henceroth, Phoenix alleges that he continued to receive care for his shoulder. On October 18, 2023, two days after Phoenix last saw Dr. Henceroth, Phoenix had an outside specialist appointment with VCU neurosurgeon Dr. Grere who ordered Phoenix to see VCU orthopedics. (ECF No. 23 ¶ 23.) Between October 18, 2023 and October 27, 2023, Phoenix had an x-ray of his shoulder, and on October 27, 2023, Dr. Trogoski ordered Phoenix to be seen by VCU orthopedics. (ECF No. 23 ¶ 24.) On December 5, 2023, Phoenix saw a VCU orthopedic surgeon who ordered an MRI, Tylenol, and a left sling. (ECF No. 23 ¶ 25.) Phoenix did not receive the sling. (ECF No. 23 ¶ 25.) On December 19, 2023, Phoenix had an MRI of his shoulder. (ECF No. 23 ¶ 26.)
On February 21, 2024, Phoenix returned to VCU for an MRI follow up and the doctor recommended full left shoulder replacement surgery. (ECF No. 23 ¶ 27.) On April 12, 2024, Phoenix had "a full shoulder replacement surgery." (ECF No. 23 ¶ 28.)

were reasonable, timely, and appropriate and were based on the patient's entire clinical picture at the time.

> To the extent Plaintiff disagrees with the treatment [he] recommended, [he] made these determinations based on my medical training, knowledge, education, and expertise as an orthopedic surgeon, and based on his entire clinical picture at the time.

(ECF No. 89-2 ¶¶ 32, 33.)

### H. Nurse Schnur's Involvement in Phoenix's Care

#### 1. Nurse Schnur's Role is Administrative

Nurse Schnur was the Healthcare Services Administrator ("HSA") at DCC during the time Phoenix was incarcerated in that facility. (ECF No. 89-3 ¶ 8.) Despite Phoenix's insistence that she was "a treating nurse," (ECF No. 96-1, at 2), as the HSA, that was not her role. (ECF No. 89-3 ¶ 8.) Instead, her role

> was administrative, not clinical. In this role, [she] provided administrative oversight of the medical services at DCC, which included overseeing healthcare staffing needs at DCC, coordinating resources involved in the delivery of healthcare, ensuring compliance with applicable regulations affecting the delivery of healthcare at DCC, and coordinating inmate medical services involving various disciplines.

(ECF No. 89-3 ¶ 8.) Nurse Schnur explains that her "position did not involve direct patient care." (ECF No. 89-3 ¶ 9.) Although Nurse Schnur is a registered nurse, "in the chain of command, the nursing staff report to the Director of Nursing. [She was] not their supervisor as [her] role [was] administrative." (ECF No. 89-3 ¶ 10.) As a nurse, Nurse Schnur did not and could not "make medical diagnoses" or "order diagnostic imaging studies, medications, [or] make referrals." (ECF No. 89-3 ¶ 12.) Nurse Schnur is also not involved in decisions about whether the VDOC would pay for inmate care. (ECF No. 89-3 ¶ 14.)

#### 2. Meetings with Phoenix

Phoenix contends that Nurse Schnur was present at several medical appointments and during administrative meetings about his collective, chronic care, and that she responded to

grievance materials. Besides her presence at the two medical appointments with the doctor described above, Nurse Schnur was also present at Phoenix's chronic care visit with Dr. Sharma on February 16, 2022 where he noted shoulder pain. (ECF No. 96-1, at 7.) Phoenix met with Nurse Schnur on October 17, 2022, and with Nurse Schnur and FNP Marinos on October 18, 2022. (ECF No. 96-1, at 9.) On October 17, 2022, Phoenix met with Nurse Schnur for a teleconference with the dietician about Phoenix's celiac disease. (ECF No. 96-1, at 9.) Nurse Schnur listed Phoenix's medical complaints including his "medical diet, headaches and dizziness, MRI for neck and back, dietary supplements, hearing issues, [and] issues with arm and shoulder," and that his medical boots were falling apart. (ECF No. 96-1, at 9 (numbering omitted).) Phoenix notes that "[h]er operating plan is to meet with provider and discuss a plan of care." (ECF No. 96-1, at 9.)[26] The following day, Phoenix met with Nurse Schnur and FNP Marinos "and discussed several issues to include his left arm and shoulder." (ECF No. 96-1, at 9.)

Nurse Schnur was next involved with Phoenix on January 5, 2023, when she wrote a note during a meeting "that [Phoenix] will be seen by VCU Neurosurgery for shoulder complaints and neck and back." (ECF No. 96-1, at 10.)

### 3. Nurse Schnur's Response to Grievance Material

Nurse Schnur responded to Phoenix's grievance materials in which he simultaneously complained about a host of ailments in vague terms.[27] Phoenix filed two grievances on July 31,

---

[26] Phoenix includes statements about "requesting Ums" or "UMD," but fails to explain what this means, therefore it is of no use in assessing the propriety of summary judgment. (*See* ECF No. 96, at 9.)

[27] The Court does its best to include useful information from Phoenix's declaration about Nurse Schnur's involvement. The Court does not include stray references to Nurse Schnur's name where it does not appear that she responded to the grievance material or where it appears to be repetitive.

2021, about not "receiving the MRI . . . for my left elbow," to which Nurse Schnur responded an MRI had been scheduled. (ECF No. 96-1, at 13.) Phoenix filed a written complaint on July 31, 2021, complaining "about not receiving proper medical care which led to continued medical and emotional harm, to which RN Schnur responded that I was seen and evaluated in accordance with policy." (ECF No. 96-1, at 13.) On October 18, 2021, Phoenix filed an informal complaint complaining about "the continued lack of care for my medical issues, . . . and Schnur responds that I have been seen and evaluated by policy but still not MRI for my arm or treatment as well as delays over all in my care for several issues. Again, Schnur is aware but does nothing." (ECF No. 96-1, at 14.) Also on October 18, 2021, Phoenix filed a regular grievance for breach of contract of Armor Medical, and "Schnur responded to my complaint attached to the grievance stating, there is no evidence to support my claim." (ECF No. 96-1, at 14.)

On December 13, 2021, Phoenix wrote a request form to Assistant Warden Oates "in which [he] list[s] several medical complaints but specifically state [he has] been repeatedly . . . refused medical treatment and testing by ortho at Deerfield," and Nurse "Schnur replies [and] she asks what ortho is specifically not doing so they can follow up but . . . nothing is done." (ECF No. 96-1, at 14.) On November 17, 2022, Phoenix "wrote a complaint about being refused to be seen by Dr. Henceroth . . . to which Schnur responds that she discussed this during my doctor's appointment today with me and Dr. Sharma, which shows she was present at appointments with and provided direct care in my medical issues." (ECF No. 96-1, at 15.) Although the date is out of order, Phoenix indicates that he wrote a grievance on December 1, 2021, "for being refused care by Dr. Henceroth again and no MRI records were available again." (ECF No. 96-1, at 15.) "It is important to note that Schnur states that I need to provide the date of my MRI. It would be up to her to investigate this but the MRI for my arm was in my VADOC file . . . . Again, no help was provided." (ECF No. 96-1, at 15.)

On September 5, 2023, Phoenix wrote a facility request to Nurse Schnur "about the scheduling of appointments such as m[y] shoulder in which she states I am to see neurosurgery at VCU for my neck, back, and shoulder." (ECF No. 96-1, at 15.)  On October 3, 2023, Phoenix "sent a facility request to RN Schnur asking what policy states about seeing providers such as Dr. Henceroth when I am [in] pending litigation and the fear of retaliation from no care and she responded that she cannot provide legal advice" and states that, "I cannot choose my provider." (ECF No. 96-1, at 16.)[28]

Phoenix was transferred from the DCC to a different VDOC facility on January 9, 2024, and Nurse Schnur had no further contact with him at that point.  (ECF No. 89-3 ¶16.)

## V.  Analysis

### A.  Eighth Amendment Principles

To survive summary judgment, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'"  *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

---

[28] Phoenix then lists nearly two full pages, single-spaced of citation to individual "complaints about medical issues in which Schnur was involved and provided the same incomplete improper implementation of her job duties because if she properly investigates the issues then corrections would have been made."  (ECF No. 96-1, at 16–17.)  This list provides the Court with no useful facts about Nurse Schnur's involvement in Phoenix's medical care for his elbow and shoulder.

recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2). "Importantly, a prison official 'who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he or she] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (alterations in original) (quoting *Farmer*, 511 U.S. at 844).

29

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).  Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).  Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04).  In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).  Thus, "[t]he Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves 'the question whether additional diagnostic techniques or forms of treatment [are] indicated.'" *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 107).

### B. Dr. Henceroth

In Claim Three, Phoenix contends that Dr. Henceroth "[is] and remain[s] deliberately indifferent to my serious medical shoulder and elbow conditions through [his] actions of not providing timely access to medical testing, timely access to surgical corrections, and failing to provide the proper standard of medical care" in violation of the Eighth Amendment.  (ECF No. 23, at 18.)  However, Phoenix fails to demonstrate that Dr. Henceroth was deliberately indifferent to Phoenix's serious medical needs.  The record clearly establishes that, in his limited

role as an outside provider and orthopedist to whom Phoenix was referred, Dr. Henceroth provided constitutionally adequate care. Here, Phoenix disagrees with the timing and course of care he received, both of which fail to establish a claim of deliberate indifference.

As a preliminary matter, Phoenix's elbow injury, biceps tear, and shoulder injury are certainly serious medical needs. Nevertheless, the record makes clear that Dr. Henceroth did not act with indifference to Phoenix's complaints or his injuries. Phoenix was referred to Dr. Henceroth, a general orthopedic surgeon, on May 21, 2021, around five months after Phoenix was first seen for his elbow pain, and the day after Phoenix reported further injuring himself while lifting weights. (ECF No. 89-2 ¶¶ 11, 15–16.) Dr. Henceroth examined Phoenix and initially diagnosed the injury as a sprain of the left elbow and shoulder, and he recommended that Phoenix continue to take Motrin and Tylenol, to ice the area, and that Phoenix should refrain from working. (ECF No. 89-2 ¶ 16.)[29]

Phoenix was referred back to Dr. Henceroth, two weeks later, on June 2, 2021. (ECF No. 89-2 ¶ 17.) Because Phoenix's symptoms had not improved with the initial conservative treatment that Dr. Henceroth prescribed, Dr. Henceroth determined that additional measures needed to be taken. (ECF No. 89-2 ¶ 17.) Dr. Henceroth recommended that Phoenix continue to use a sling and to have an MRI of his left shoulder and left elbow to rule out a rupture of his left biceps tendon. (ECF No. 89-2 ¶ 17.) The following day, Phoenix was sent to Ortho Virginia, to an orthopedist, Dr. Dalton, who questioned Phoenix's history as "confusing," and noted that "[h]is pain is out of proportion" to clinical findings, and that his "elbow appears to be the major source of his pain today," despite being referred for his shoulder. (ECF No. 89-1, at 27–28.)

---

[29] Although Phoenix repeatedly insists that, "[w]ithout proper imaging, it was reckless to diagnose anything or injuries he could not see," (ECF No. 96, at 33, 36), Phoenix is not competent to provide medical opinions.

Because Dr. Dalton could "not rule out a partial tear" of the biceps tendon despite it being palpable, he ordered an "MRI elbow left without contrast," and provided Phoenix with a referral for an MRI for his left elbow only. (ECF No. 89-1, at 27–28.) Dr. Dalton did not order an MRI of Phoenix's shoulder. Clearly, the record reflects that Dr. Henceroth and Dr. Dalton suspected the same injury.

On June 16, 2021, Phoenix saw Dr. Henceroth and he noted that he needed to check on the status of the referral for an MRI. (ECF No. 89-2 ¶¶ 19, 23.) Dr. Henceroth determined that Dr. Harris had placed the order for an MRI that day. (ECF No. 89-2 ¶ 19.) The MRI did not occur until August 30, 2021, because of scheduling issues. (ECF No. 89-2 ¶ 21; ECF No. 89-1, 39–40.) Although Phoenix is unhappy about the delay in scheduling of the MRI, Dr. Henceroth could only make recommendations and had no control over the timing and the manner in which his recommendations were implemented. (ECF No. 89-2 ¶ 3.) Thus, Phoenix's contention that Dr. Henceroth was deliberately indifferent to his "elbow condition[] through [his] actions of not providing timely access to medical testing," (ECF No. 23, at 18), is belied by the record.

Dr. Henceroth did not see Phoenix again until September 30, 2021, after his MRI showed a partial biceps tear on August 30, 2021. (ECF No. 89-2 ¶¶ 21, 23.) At that appointment, Dr. Henceroth provided Phoenix with an elbow sleeve and advised him to follow up as needed. (ECF No. 89-3 ¶ 23.) Dr. Henceroth "did not believe that further intervention was necessary at that time, and concluded, based on [his] medical education, training and experience as an orthopedic surgeon, that Phoenix's condition at that time could be adequately managed with conservative treatment." (ECF No. 89-2 ¶ 23.)

Dr. Henceroth "was not involved further with [Phoenix] until December 1, 2021," when he was referred to him for complaints of posterior elbow pain. (ECF No. 89-2 ¶ 24.) After a physical examination, Dr. Henceroth recommended that Phoenix should continue the

32

conservative management of the partial biceps tear and remain under observation. (ECF No. 89-2 ¶ 24.) Dr. Henceroth was not involved in Phoenix's care again until nearly a year later on November 9, 2022. (ECF No. 89-2 ¶ 28.) However, between December 2021, and November 9, 2022, Phoenix was referred back to Ortho Virginia where he and a PA discussed continuing conservative treatment as an option versus surgical intervention. (ECF No. 89-1 at 34–35.) However, Phoenix chose to pursue surgery, and on April 28, 2022, Phoenix had surgery for left biceps repair. (ECF No. 89-1 at 30–31.)

Phoenix fails to establish that Dr. Henceroth knew of and disregarded an excessive risk to Phoenix's health or safety necessary to show a constitutional violation. Dr. Henceroth was only involved with Phoenix's care on a referral basis for his many ailments and he did not control when he saw Phoenix. (ECF No. 89-2 ¶¶ 2–3.) It appears that, at most, Phoenix disagreed with the decision to follow a conservative treatment plan prescribed by Dr. Henceroth. However, the record shows that even the provider at Ortho Virginia discussed continuing a conservative treatment plan with Phoenix during this time. At the base of his claims, Phoenix was simply not entitled to the medical care of his choosing at any given time. *Wright*, 766 F.2d at 849 (citations omitted); *Bowring*, 551 F.2d at 48 ("disavow[in]g any attempt [of the Court] to second-guess the propriety or adequacy of a particular course of treatment"); *see Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("It is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment." (citations omitted)); *Roe. v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2008) (explaining that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances" (citation omitted).) Phoenix fails to show that Dr. Henceroth's prescribed course of treatment reflected deliberate indifference to his elbow injury.

With respect to his shoulder injury, once again Phoenix fails to demonstrate that Dr. Henceroth was deliberately indifferent to Phoenix's serious medical needs. It is not entirely clear from the record whether this injury was distinct from the torn biceps tendon, or if repairing the biceps tendon simply failed to resolve all of Phoenix's pain. However, Dr. Henceroth had an even more limited role in the later treatment and care for Phoenix's shoulder. As noted above, after two weeks of conservative treatment failed to help with Phoenix's elbow and shoulder pain, Dr. Henceroth recommended that Phoenix have an MRI of his left shoulder along with the left elbow to rule out a rupture of his left biceps tendon. (ECF No. 89-2 ¶ 17.) The orthopedist at Ortho Virginia, Dr. Dalton, instead noted that Phoenix's "elbow appears to be the major source of his pain today," despite being referred for his shoulder. (ECF No. 89-1, at 27–28.) Dr. Dalton ordered an "MRI elbow left without contrast," and provided Phoenix with a referral for an MRI for his left elbow *only*. (ECF No. 89-1, at 28.) Although Phoenix wanted an MRI of his shoulder at that point, and at the root of this claim, Phoenix blames Dr. Henceroth for personally cancelling the MRI for his shoulder, that is belied by the record. Dr. Henceroth recommended an MRI of Phoenix's shoulder, however it was not approved or ordered. The decision about whether to order an additional MRI of Phoenix's shoulder at that juncture was not one that Dr. Henceroth was authorized to make. Moreover, a different orthopedic specialist determined that an MRI of Phoenix's shoulder was not necessary based on his clinical findings. Thus, despite Phoenix's contentions to the contrary, Dr. Henceroth cannot be faulted for "not providing timely access to medical testing," as Phoenix suggests. (ECF No. 23, at 18.)

The MRI showed a partial biceps tear, and Dr. Henceroth believed that conservative treatment was appropriate. Without the involvement of Dr. Henceroth, on April 28, 2022, Phoenix had surgery to correct the partial biceps tear, and he attended many months of physical therapy through September 27, 2023. (ECF No. 23 ¶ 21.)

Phoenix claims that Dr. Henceroth "chose to ignore the pain, numbness and motility issues and caused the shoulder injury to worsen and ultimately led to the need for a replacement and loss of his 'natural shoulder,'" which "are not acts of a reasonable or prudent practitioner." (ECF No. 96, at 39.)  That is simply not true.  Dr. Henceroth was not involved in Phoenix's medical care for his elbow or shoulder from December 1, 2021, until November 9, 2022, when Phoenix was referred to Dr. Henceroth for complaints of shoulder pain and intermittent numbness of his thumb and index finger.  (ECF No. 89-1, at 36; ECF No. 89-2 ¶ 28.)  Phoenix showed no neurological defects when Dr. Henceroth conducted a physical examination, and Dr. Henceroth believed that conservative treatment was appropriate.  (ECF No. 89-2 ¶ 28.)  Dr. Henceroth recommended that Phoenix remain under observation and to see how he would progress with non-invasive treatment.  (ECF No. 89-2 ¶ 29.)  The crux of Phoenix's argument appears to be that he desired an MRI sooner than he received it.  However, "[t]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray [or MRI], or like measures, does not represent cruel and unusual punishment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *see Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is a 'a classic example of a matter for medical judgment'" (citing *Estelle*, 429 U.S. at 107)).

Dr. Henceroth again had no involvement in Phoenix's medical care for his shoulder, from November 9, 2022, until October 16, 2023, when Phoenix was referred to him for his left shoulder pain.  (ECF No. 89-2 ¶ 28.)  Based on Phoenix's complaints and a physical exam, Dr. Henceroth referred Phoenix for x-ray imaging of his shoulder and a referral for a physical therapy evaluation.  (ECF No. 89-2 ¶ 29.)  Dr. Henceroth requested that Phoenix follow-up with

35

him in approximately one month.  (ECF No. 89-2 ¶ 29.)  However, Dr. Henceroth had no further interactions with Phoenix after October 16, 2023.  (ECF No. 89-2 ¶ 30.)

Although Phoenix ultimately received a total shoulder replacement, Dr. Henceroth was not deliberately indifferent to Phoenix's complaints of shoulder pain.  Phoenix saw Dr. Henceroth on a limited and extremely intermittent basis in conjunction with many other prison physicians and outside orthopedic specialists.  At the referral appointment on November 9, 2022, Dr. Henceroth first prescribed conservative treatment.  Nearly a year later when Dr. Henceroth saw Phoenix for a second time, and he noted that there was no improvement, he recommended further diagnostics and a referral to physical therapy.  Dr. Henceroth did not treat Phoenix for his shoulder during this lengthy period.  Once again, Phoenix complains of nothing more than a disagreement with Dr. Henceroth's professional medical opinion about the appropriate course of treatment and its timing, and thus, he fails to establish a cognizable constitutional claim, much less deliberate indifference. *Wright*, 766 F.2d at 849.[30]  Phoenix puts forth no evidence from which a jury reasonably could find that Dr. Henceroth's exercise of medical judgment was "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851.

In sum, Phoenix fails to demonstrate that Dr. Henceroth knew of and disregarded a substantial risk of harm to Phoenix.  Accordingly, Phoenix does not show that Dr. Henceroth was

---

[30] To the extent that Phoenix faults Dr. Henceroth for delaying care for his shoulder, which allegedly led to a full shoulder replacement, the outside orthopedic provider agreed with Dr. Henceroth that Phoenix's biceps tendon was the problem.  Then after Phoenix had biceps tendon surgery and still experienced pain, Phoenix was only referred to Dr. Henceroth two times for his shoulder during a two-year period.

Even though Dr. Henceroth had a very limited role in treating Phoenix for his shoulder, the Court notes that, contrary to Phoenix's suggestion otherwise, "[u]nsuccessful medical treatment . . . do[es] not constitute deliberate indifference." *Golbert v. Coldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

deliberately indifferent to his elbow or shoulder injury.  Claim Three against Dr. Henceroth will be DISMISSED.

### B. **Nurse Schnur**

As with Dr. Henceroth, Phoenix contends that Nurse Schnur was "deliberately indifferent to [his] serious medical shoulder and elbow conditions through [her] actions of not providing timely access to medical testing, timely access to surgical corrections, and failing to provide the proper standard of medical care" in violation of the Eighth Amendment.  (ECF No. 23, at 18.) Phoenix fails to direct the Court to any admissible evidence that Nurse Schnur acted with deliberate indifference to his elbow or shoulder injuries.  Phoenix insists that Nurse Schnur "was in fact a treating nurse in the beginning of [Phoenix's] incarceration and provided direct treatments throughout, her large role however was also as an administrator in 'gatekeeping role' and was deliberately indifferent on both levels of her duties."  (ECF No. 96, at 40.)  As a preliminary matter, whether Nurse Schnur provided Phoenix with medical care as a treating nurse when he first entered the VDOC, in 2019, is not relevant, as his first alleged interaction with her pertaining to his elbow and shoulder was in 2021.  (ECF No. 96-1, at 6.)  Moreover, Phoenix has proffered no evidence beyond his own blanket assertion that Nurse Schnur was involved in direct patient care.

Clearly, Nurse Schnur attended meetings with medical staff and Phoenix, and responded to his grievances, but her role was limited to providing administrative assistance and oversight in coordinating care for Phoenix's abundant medical complaints and desires.  (ECF No. 89-3 ¶ 8.) Moreover, it is undisputed that Nurse Schnur was aware of Phoenix's abundant medical problems and his obvious disagreement with the treatment he was receiving.  While an inmate's grievance materials may establish a basis for § 1983 liability, the plaintiff must demonstrate "that the communication, in its content and manner of transmission, gave the prison official sufficient

notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837).  Phoenix must show that Nurse Schnur "knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." *Id.* at 994 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).  Phoenix fails to make this showing.  Phoenix complained incessantly about his abundant medical care.  The fact that Nurse Schnur provided responses to his grievance material that did not satisfy Phoenix, standing alone, does not make her deliberately indifferent. *See George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) (explaining that simply "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation.")

While Phoenix believes that he was receiving inadequate medical care and lodged the same complaint in his grievances and during administrative meetings where Nurse Schnur was present, the record reflects that he was simultaneously receiving substantial medical care for his elbow and shoulder, amongst other ailments.  Nurse Schnur knew that Phoenix was frequently seen by and treated by the medical department.  According to his Particularized Complaint, between 2021 and 2024, Phoenix saw medical providers at least sixty-two times, *see Phoenix v. Clarke*, No. 3:23CV276, 2025 WL 259382, at *7 & n.11 (E.D. Va. Jan. 21, 2025), from Phoenix's own admissions it is evident that he received pain medication, had x-rays, two MRIs, saw an onsite orthopedist and two orthopedic specialists and a neurologist, had elbow surgery, had twenty-eight physical therapy sessions, and then had a complete shoulder replacement surgery. *See id.* at *7.  Phoenix was under the care of many medical providers including those within the institution and several outside specialists.  Nurse Schnur, who served in an administrative capacity, and did not provide direct patient care, was entitled to rely on the medical judgment of those abundant treating medical providers with respect to the appropriate

treatment of Phoenix. *Iko*, 535 F.3d at 242 (holding that once an inmate is placed in the care of appropriate medical personnel, "a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir 2004))).

Even if she met with Phoenix and discussed his case and provided "direct care," as Phoenix insists, absent extraordinary circumstances not present here, Nurse Schnur, as a nurse, was not able to diagnose ailments or order diagnostic studies, medications, or make referrals to specialists. (ECF No. 89-3 ¶ 11.) Nurse Schnur was also entitled to rely upon the medical judgment of the many doctors with respect to the proper course of treatment for Phoenix's injury. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 539 (3d Cir. 2017) (concluding nurse acted with no deliberate indifference by following doctor's orders); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (citation omitted) (observing that "a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, [but] that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient"). In the end, Nurse Schnur was aware of Phoenix's complaints about the timing and course of treatment for his elbow and shoulder. However, that fails to make her deliberately indifferent to those concerns. Because Phoenix fails to demonstrate that Nurse Schnur knew of and disregarded a substantial risk of harm to Phoenix, Claim Three against her will be DISMISSED.

## VI. Conclusion

The Motion to Stay, Motion for Discovery and Issuance of Subpoenas, Motion for Appointment of Counsel, and Motion to Strike (ECF Nos. 115, 116, 118, and 126) will be DENIED. The Motion for Leave to File a Consolidated Response (ECF No. 123) will be DENIED. The First Motion for Summary Judgment (ECF No. 88) will be GRANTED. Claim

Three against Dr. Henceroth and Nurse Schnur will be DISMISSED, and the Clerk shall terminate them as parties in this action.

An appropriate Order shall issue.

| Date: 2/27/26 | /s/ |
|---|---|
| Richmond, Virginia | M. Hannah Lauck |
|  | Chief United States District Judge |