IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DANIEL W. PHOENIX,

    **Plaintiff,**

**v.**                                  **Civil Action No. 3:23cv276**

HAROLD CLARKE, *et al.*,

    **Defendants.**

## MEMORANDUM OPINION

Daniel W. Phoenix,[1] a former Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[2] Phoenix contends that Defendants[3] denied him adequate medical care with respect to an elbow and shoulder injury while he was incarcerated in the Deerfield Correctional Center ("DCC"). The matter is before the Court on the Second Particularized Complaint (ECF No. 23), the Motion for Summary Judgment (ECF No. 104) filed by Defendants Dr. Alvin Harris, Dr. Kshitij Sharma, Advanced Practice Registered Nurse

---

[1] During the course of this litigation, Phoenix changed his last name from Jamison to Phoenix.

[2] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[3] By Memorandum Opinion and Order entered on January 21, 2025, the Court dismissed the claims against Defendants Clarke, Amonette, Herrick, Miller, Oates, and, J. Harris. (ECF Nos. 69, 70.) By Memorandum Opinion and Order entered on February 27, 2026, the Court dismissed the claims against Defendants Henceroth and Schnur. (ECF Nos. 129, 130.) The Court corrects the spelling of Defendants' names.

("APRN") Steven Marinos, and RN Tiffany Powell ("Defendants"), and the Court's screening obligations under pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A. The Court provided Phoenix with notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). (ECF No. 107.) Phoenix filed a Motion for Leave to File Response to Summary Judgment with an accompanying Response that will be discussed below. (ECF No. 96.) Because Phoenix received an extensive amount of medical care and simply disagreed with the timing and course of the care, the Motion for Summary Judgment will be GRANTED.

## I. Procedural History and Remaining Claim

As the Court noted in the January 21, 2025 Memorandum Opinion, Phoenix fails to set forth one clear set of claims for relief in his Second Particularized Complaint. Instead, he has sections entitled, "CIVIL RIGHTS VIOLATED AND THE DEFENDANTS ALLEGEDLY RESPONSIBLE" (ECF No. 23, at 13–16), "LEGAL THEORIES OF THIS COMPLAINT" (ECF No. 23, at 16–17), and then finally, "COUNTS AND CLAIMS OF THIS COMPLAINT" (ECF No. 23, at 17–19). Reading the document liberally, the Court construed Phoenix to raise three claims for relief. (*See* ECF No. 69, at 8.) The following claim remains:

> Claim Three: Defendants Dr. Harris, Dr. Friend, Dr. Sharma, APRN Marinos, and RN Powell "are and remain deliberately indifferent to my serious medical shoulder and elbow conditions through their actions of not providing timely access to medical testing, timely access to surgical corrections, [and] failing to provide [the] proper standard of medical care" in violation of the Eighth Amendment.[4] (ECF No. 23, at 18.)

Phoenix seeks a large sum of monetary damages as relief. (ECF No. 23, at 19–20.) By Memorandum Opinion and Order entered on February 27, 2026, the Court dismissed a number of motions that the Court perceived as filed in bad faith and as dilatory. However, currently

---

[4] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

2

pending before the Court is Phoenix's Motion for Leave to File Response to Summary Judgment. (ECF No. 120.)

As is his practice, Phoenix has disregarded the rules and the directives of the Court in his Response. As discussed below, in Part IV, prior to turning to the merits of the Motion for Summary Judgment, the Court first dismisses the claim against Dr. Friend and then discusses the Motion for Leave to File Response to Summary Judgment and the Response itself.

## II. Preliminary Review of Complaint

Pursuant to the Prison Litigation Reform Act ("PLRA") this Court must dismiss any action filed by a prisoner if the Court determines the action (1) "is frivolous" or (2) "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2); *see* 28 U.S.C. § 1915A. The first standard includes claims based upon "an indisputably meritless legal theory," or claims where the "factual contentions are clearly baseless." *Clay v. Yates*, 809 F. Supp. 417, 427 (E.D. Va. 1992) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). The second standard is the familiar standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more

3

than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *id.* (citation omitted), stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556). In order for a claim or complaint to survive dismissal for failure to state a claim, therefore, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)). Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it does not act as the inmate's advocate, *sua sponte* developing statutory and constitutional claims the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

In his Second Particularized Complaint, Phoenix contends that "[w]hile working out on the rec yard on December 9, 2020, [he] injured his left elbow and left shoulder," and heard a "a

4

loud 'pop' when the injury occurred." (ECF No. 23 ¶ 5.) Phoenix was seen by Dr. Friend that same day, and Dr. Friend prescribed him Tylenol. (ECF No. 23 ¶ 6.) Phoenix criticizes Dr. Friend for not ordering testing or a sling. (ECF No. 23 ¶ 6.) This is the only time Dr. Friend saw Phoenix or was involved with his medical care for his elbow or shoulder.

To allege an Eighth Amendment claim, an inmate must allege facts that indicate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994). That plainly is not the case here based on the limited allegations against Dr. Friend.

Phoenix fails to allege facts that would suggest that Dr. Friend was deliberately indifferent to his serious medical needs through this one examination immediately after his injury. Rather, according to Phoenix, Dr. Friend assessed him and provided him with pain relief. Dr. Friend's treatment of Phoenix was neither grossly incompetent nor shocks the conscience. Accordingly, Claim Three against Dr. Friend will be DISMISSED. Dr. Friend will be DISMISSED as a party in the action.[5]

---

[5] Moreover, the record on summary judgment reinforces the fact that Dr. Friend was not deliberately indifferent to Phoenix's injury, as it mirrors Phoenix's allegations in the Complaint. Dr. Friend only saw Phoenix once immediately after the injury, examined Phoenix's elbow, and provided him with pain relief. (*See infra* Part IV.A.)

### III. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448).

In support of their Motion for Summary Judgment, Defendants submit: Phoenix's medical records (ECF No. 105-1); the declaration of Defendant Dr. Alvin Harris (ECF No. 105-2), who attests that the attached medical records are true and correct; the declaration of

6

Defendant Dr. Kshitij Sharma (ECF No. 105-3); and, a timeline or summary of Phoenix's interactions with Defendant APRN Marinos (ECF No. 105-4).

### IV. Phoenix's Response in Opposition

Phoenix's Motion for Leave to File Response to Summary Judgment (ECF No. 120) will be GRANTED to the extent that his Response to the Motion for Summary Judgment ("Response," ECF No. 122), which greatly exceeds the page limit prescribed by the Local Rules, is FILED and will be considered by the Court.

The Court's evaluation of Phoenix's current conduct does not occur in a vacuum. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (explaining that a Court may review other court records); *Clay v. Yates*, 809 F. Supp. 417, 427–28 (E.D. Va. 1992) ("it is appropriate to consider what the court's records show about the number and kinds of cases instituted by the *pro se* litigant, and the extent to which the conduct of that litigant constitutes and an abuse of the judicial process" (citations omitted)). Two years ago, the Court observed that although Phoenix is appearing *pro se*, "he is a sophisticated litigant." *Jamison v. Clark*, No. 3:22CV425, 2024 WL 251927, at *7 (E.D. Va. Jan. 23, 2024) ("*Jamison I*"). The Court observed that, "Jamison has an expansive history of unnecessarily protracting litigation by improper complaints and ignoring the Court's directions." *Id.* at *8. The Court found that Phoenix's "conduct in the present action alone stands as a testament to his inclination to ignore the Federal Rules of Civil Procedure, the Court's orders, and to proceed in manner of his own choosing." *Id.* As explained below, in the present action, Phoenix continues inclination "to ignore the Federal Rules of Civil Procedure, the Court's orders, and to proceed in manner of his own choosing." *Id.*

At this stage, the Court is tasked with assessing whether Phoenix "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at

7

trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although Phoenix filed a Response (ECF No. 122), it fails to comply with the rules governing such responses. As a preliminary matter, the Court understands that Phoenix is *pro se*; however, he is no longer incarcerated and therefore no longer faces the same impediments he did as a prisoner. Moreover, Phoenix's submissions demonstrate that he is a sophisticated litigant. Although Phoenix's *pro se* status makes him "entitled to some deference," it does not relieve him of his duty to abide by the rules and orders of this Court. *Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989) (citation omitted). Over the course of the nineteen lawsuits Phoenix has filed in this division, the Court has had to repeatedly remind -- sometimes in the same case -- Phoenix of his obligation to follow the instructions provided by the Court and the rules of the Court. Phoenix has consistently disregarded the Court's orders. *See, e.g., Jamison I*, 2024 WL 251927, at *7–11 (discussing Phoenix's "expansive history of unnecessarily protracting litigation . . . and ignoring the Court's directions" and the consequences of his repeated failure to comply with the Court's orders).

In order to ensure that the parties shoulder their respective burdens for a motion for summary judgment, Local Rule 56(B) requires that:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and *citing the parts of the record relied on to support the facts alleged to be in dispute.* In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added). In Phoenix's Response, he has a section titled "GENUINE ISSUES TO BE LITIGATED," however it is a rambling narrative that only cites back to his own statement of the medical facts in his Response. (ECF No. 122-1, at 33.) Thus, the Response wholly fails to include a specifically captioned section listing "the relevant parts of the record relied on to support the facts alleged to be in dispute." *Id.* Therefore, the Court can assume the remainder of facts identified by the Defendants in their list of material facts are admitted. E.D. Va. Loc. Civ. R. 56(B).

Phoenix attached to his Response 223 pages of medical records, grievance material, correspondence, and other information. (ECF No. 122-2 through 122-4.) Phoenix, however, fails to provide any useful citation to individual documents. Apparently, Phoenix expects the Court to sort through this material to ascertain whether Defendants' actions were appropriate. The Court is not obliged to do so. *See Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010) (noting it is a party's "job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out"). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). Rather, "[t]he court need consider only the cited materials . . . ." Fed. R. Civ. P. 56(c)(3); *see Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (alterations in original) (observing that "[j]udges are not like pigs, hunting for truffles buried [in the record]" (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010))). Thus, these materials are of little use in deciding the propriety of summary judgment. Nevertheless, the Court has reviewed the medical records attached to his Response and has determined that they provide a more fulsome picture of

9

Phoenix's medical care than what Defendants provided.[6] The Court includes information from those records where relevant.

Finally, Phoenix's Response is rambling, repetitive, and because of that, is unnecessarily lengthy. For example, in addition to his section labeled "STATEMENT OF MATERIAL FACTS" (ECF No. 122-1, at 11), Phoenix has yet another section entitled, "Complete Medical Facts of the Case with omitted facts by the Defendants," (ECF No. 122-1, at 15–33),[7] followed by "GENUINE ISSUES TO BE LITIGATED." (ECF No. 122-1, at 33.) All three contain different, repetitive, statements of fact and no citation to the record to support these facts. Moreover, the section of purported "genuine issues" contains statements that are simply false. For example, Phoenix indicates he had "no pain management," but then directly after that states that he was prescribed Tylenol or ibuprofen. (ECF No. 122-1, at 37 (emphasis omitted).) Phoenix also includes information unrelated to the allegations in the Second Particularized Complaint.[8] Phoenix adds stray remarks that suggest new theories of liability such as claiming

---

[6] The Court determined such a review was necessary because Phoenix mentioned various appointments throughout his Response that were not noted by Defendants. Defendants seemingly omitted medical records where Phoenix complained of ailments, including his elbow and shoulder, to medical staff that were not the named Defendants.

[7] As mentioned previously, because there were additional appointments noted in this section, the Court reviewed Phoenix's attached medical records.

[8] Phoenix has filed so many suits against the same defendants that it is likely difficult for him to keep them straight. The Court notes that, in addition to his complaints about his elbow and shoulder, simultaneously, Phoenix complained incessantly to many of the same Defendants about his hearing loss and tinnitus, his neck and back pain, an ankle injury after a fall off a van, celiac disease, other food sensitivities, pulmonary and breathing issues. *See, e.g., Phoenix v. Clarke*, No. 3:23cv276, 2026 WL 21754, at *2 n.4 (E.D. Va. Jan. 5, 2026) (citations omitted); *Phoenix v. Vital Core Health Strategies*, No. 23cv357, 2025 WL 2313208, at *3 (E.D. Va. Aug. 11, 2025) (explaining that between 2019 and 2024, Phoenix complained about "celiac disease, a torn bicep tendon, neck and back injuries, hearing issues, breathing issues, dental problems and other ailments" and "was seen scores of times for these medical issues"); *Phoenix v. Herrick*, No. 3:23cv335 (E.D. Va. filed May 18, 2023) (suing over fall from transport van and treatment for ankle injury). In one lawsuit alone filed in this division, Phoenix claimed that he had "celiac

that Defendants "failed to provide proper pain management" (ECF No. 122-1, at 7–8),[9]

Defendants violated VDOC policies (ECF No. 122-1, at 46–47), and drops asides that sound in

negligence, such as Defendants were not reasonably prudent. (*See, e,g.*, ECF No. 122-1, at 47.)

However, Phoenix may not add new claims or allegations in a responsive brief. *See Hurst v.*

*Dist. of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017) (noting that "a plaintiff may not amend

her complaint via briefing") (citing *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d

173, 181 (3d Cir. 1988)); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 847 F. Supp. 2d

843, 851 n.9 (E.D. Va. 2012); *Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111

(W.D. Va. 2007) (citations omitted) (explaining that "new legal theories must be added by way

of amended pleadings, not by arguments asserted in legal briefs"). To the extent Phoenix

attempts to bring new claims, they will receive no further consideration here.[10]

Phoenix attached his own Declaration to his Response. (ECF No. 122-1, at 51–56.) The

facts offered by an affidavit or sworn declaration must be in the form of admissible evidence.

---

disease, inguinal hernia, umbilical hernia, serious neck and back pain with nerve pain, hemorrhoids, pain management, dermatitis hepiformas, foot problems, malnutrition, tinnitus in ears, dental erosion, and mental problems," as well as peripheral neuropathy and paresthesis. *Jamison v. Northam*, No. 3:20cv339 (E.D. Va. May 13, 2020), ECF No. 1, at 8, 14 (spelling and capitalization corrected).

Between August 2019 and 2024, Phoenix filed at least nineteen lawsuits in this division alone challenging various aspects of his medical care that have required the Court to expend a great deal of time and resources to resolve. Phoenix has filed vexatious and repetitive lawsuits against numerous Virginia Department of Corrections ("VDOC") employees, medical providers, and even attorneys for the Commonwealth charged with defending the actions, for every alleged ailment simply because he was dissatisfied with the level and type of care he received.

[9] The Second Particularized Complaint contained no such claim. (*See* ECF No. 23, at 12–15, 17–19.)

[10] At the end of the Response, Phoenix once again repeats his refrain that, "currently summary judgment is inappropriate due to lack of discovery." (ECF No. 122-1, at 49–50 (capitalization corrected) (emphasis omitted).) The Court addressed these vague and unpersuasive arguments in the February 27, 2026 Memorandum Opinion and will not do so again here. (*See* ECF No. 129, at 7–10.)

11

*See* Fed. R. Civ. P. 56(c)(4).  In this regard, the sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.*  Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

In his Declaration, Phoenix makes numerous sworn statements that are of no value in assessing the propriety of summary judgment. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks omitted) (citations omitted) ("[a]iry generalities, conclusory assertions[,] and hearsay statements [do] not suffice to stave off summary judgment"). As a preliminary matter, Phoenix's Declaration begins with the following: "I, Daniel W. Phoenix make this declaration in support of my response to the defendants' motion for summary judgment based on my personal knowledge and beliefs of these matters as well as all relevant documents in this case under the penalty of perjury before this court." (ECF No. 122-1, at 51.) Phoenix's "beliefs" are not evidence.  Phoenix is not a medical professional and is not competent to provide a medical opinion about his elbow or shoulder nor are his personal views of any evidentiary value.  Fed. R. Civ. P. 56(c)(4); *see Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (holding that prisoner "[w]holly lacking in medical knowledge" may not give expert medical testimony).[11] Such statements will not be considered.  The Declaration also contains generalities, speculation, conclusory statements, and vague references to "Defendants." For example, Phoenix swears:

---

[11] For example, Phoenix suggests that "[t]his MRI showed that in the original injury I tore my labrum tendon which caused the shoulder to drop and formed the sublocation on the bone . . . [a]s a result of 4 years with no care other than cursory paperwork." (ECF No. 122-1, at 52.) This is nothing more than speculation and conjecture.  Moreover, Phoenix is not competent to provide a medical opinion. *See Pearson*, 237 F.3d at 886

> There are several notes in the VADOC medical records, and the medical facts w[h]ere the medical defendants reviewed the medical records, so they were aware the shoulder issues continued with pain, nerve issues and mobility issues yet at no point did these medical defendants order testing, provide pain management o[r] refer me for surgical remedy for my shoulder.
>
> . . . .
>
> At no time or point in this matter, that spans 4.5 years, can these medical defendants point to one piece of medical evidence, they provided any treatment, pain management or imaging for the shoulder. The medical records confirm this.

(ECF No. 122-1, at 53–54 (paragraph numbers and emphasis omitted).) Such conclusory assertions and assumptions are of no value in determining whether summary judgment is appropriate. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (explaining that a nonmoving party cannot "create a genuine issue of material fact through mere speculation" (citation omitted)); *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) ("Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants." (citation omitted)). Finally, the end of his Declaration is nothing more than his repeated complaint that he has not been able to conduct discovery, which is not true, and a statement that he has filed motions, which again is not evidence in support of his claims. (ECF No. 122-1, at 55.)[12]

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment. All permissible inferences are drawn in favor of Phoenix.

---

[12] To be clear, counsel for Defendants should also not be commended on their terse and lackluster briefing in support of their Motion for Summary Judgment. Nevertheless, because the medical record and the declarations filed by Defendants show that no reasonable jury could conclude that Defendants were deliberately indifferent to Phoenix's serious medical needs, the grant of summary judgment is appropriate.

## V.  Summary of Relevant Facts

As a preliminary matter, the Court notes that the record in this action is lengthy.[13]  The medical record is generally not contested by Phoenix.  Rather, Phoenix simply believes that Defendants failed to prescribe the exact treatment or order additional testing that he desired at the time he wanted it.  Despite Phoenix's apparent dissatisfaction with the prescribed treatment, however, the record reflects that Phoenix clearly received constitutionally adequate medical care for his elbow and shoulder.

### A.  Initial Injury and Appointments with Prison Staff

Dr. Alvin Harris was the former Medical Director of DCC, a role that was both administrative and clinical.  (ECF No. 105-2 ¶¶ 7–8.)  Dr. Harris provided primary direct care to Phoenix "and in so doing, [he] would have and did review clinical notes made by other members of the healthcare team including outside consultants."  (ECF No. 105-2 ¶ 8.)  Phoenix received treatment for a host of medical issues, excluding his multifaceted orthopedic care, "including anxiety, asthma, celiac disease, GERD, Barrett's esophagus, several food allergies, dermatitis, high blood pressure, an enlarged prostate, irritable bowel syndrome, obesity, chronic headaches, hearing loss, hemorrhoids, depression, diabetes, pro-traumatic stress disorder, and Sjogren's disease."  (ECF No. 105-2 ¶ 10.)[14]  Dr. Harris "personally saw [Phoenix] for a myriad of different medical issues over the course of several years . . . which required a great deal of coordination."  (ECF No. 105-2 ¶ 11.)

On December 9, 2020, Phoenix saw Dr. Friend, a prison physician, in his pod for left elbow pain that he had been experiencing for "a while," and for back pain.  (ECF No. 105-1, at

---

[13] Phoenix was seen in the medical department for many ailments.  The Court does not recite every instance where Phoenix saw Dr. Harris, Dr. Sharma, or APRN Marinos.

[14] The Court omits the secondary citations to the medical record.

14

5.) Phoenix could not recall any specific injury except that he heard something "pop" in his left arm while working out. (ECF No. 105-1, at 5.) Phoenix also wanted to know why his colonoscopy had been cancelled, and Dr. Friend directed the referral department to research this matter. (ECF No. 105-1, at 5.) Dr. Friend examined Phoenix, noted that he exhibited tenderness of the left elbow, but had a full range of motion, and did not complain of any pain in his shoulder. (ECF No. 105-1, at 5.) Dr. Friend suspected that Phoenix had tendonitis and prescribed Phoenix ibuprofen and discontinued Mobic. (ECF No. 105-1, at 5.) Dr. Friend also examined Phoenix for his lower back pain. (ECF No. 105-1, at 5.)

On December 24, 2020, Phoenix saw the nurse at sick call and reported that he hurt himself while working out, and that he was having trouble moving his left arm and it caused shooting pain in his arm. (ECF No. 105-1, at 4.) Phoenix was instructed to follow up with the doctor and was prescribed 400 mg of ibuprofen for his pain. (ECF No. 105-1, at 4.)

On January 8, 2021, Phoenix saw Dr. Harris for the first time for his elbow injury. (ECF No. 105-2 ¶ 12.) Phoenix informed him that he had injured his left elbow while working out. (ECF No. 105-2 ¶ 12.) Phoenix indicated that he was having problems flexing and extending his left elbow, and that he had been icing it and taking Motrin.[15] (ECF No. 105-2 ¶ 12.) Dr. Harris advised Phoenix not to exercise for two weeks and to continue taking Motrin. (ECF No. 105-2 ¶ 12.)

On February 3, 2021, Phoenix told the nurse that he injured his left arm while doing push-ups, and that he was taking Motrin for the left elbow pain, but that it did not relieve his discomfort. (ECF No. 105-1, at 7.) On February 7, 2021, Dr. Harris ordered Phoenix to take two 325 mg doses of Tylenol twice daily as needed for his "headache, neck and/or back

---

[15] The medical staff use Motrin and ibuprofen interchangeably in their notes.

15

complaints." (ECF No. 105-1, at 6.) On February 20, 2021, Dr. Harris reviewed a note where Phoenix reported that "[h]e believes he has gluten [allergy]" and "[he] states he has headaches all the time." (ECF No. 105-1, at 6.) On March 25, 2021, Phoenix complained about his elbow pain, scalp lesions, and celiac disease. (ECF No. 122-2, at 90.) The nurse noted that a referral was required for an ENT, colonoscopy, endoscopy, bone density scan, blood work, and for his left elbow. (ECF No. 122-2, at 90.)

On May 20, 2021, Phoenix demanded to be seen by medical and so he "flipped [a] table." (ECF No. 105-1, at 9.) Phoenix presented to the medical department reporting that "something snapped working out of yard this morning," with regard to his left arm. (ECF No. 105-1, at 9.) Phoenix complained that he could not straighten or flex his arm due to pain. (ECF No. 105-1, at 9.) That same day, Phoenix saw Dr. Harris in the clinic for elbow pain and Phoenix reported "he was pumping weights (35 lbs) with his left arm using a dumbbell when he popped something." (ECF No. 105-1, at 9.) Dr. Harris ordered a sling for Phoenix's arm, prescribed 600 mg of ibuprofen three times daily for the ten days and placed an "urgent" referral for Phoenix to see the orthopedist. (ECF No. 105-2 ¶ 12.) Dr. Harris also ordered an x-ray. (ECF No. 105-1, at 9, 71.)

## B. Phoenix's Initial Referral to Dr. Henceroth

The next day, on May 21, and upon Dr. Harris's referral, Phoenix was seen by Dr. William Henceroth, an orthopedist. (ECF No. 105-1, at 8; ECF No. 105-2 ¶ 12.) Dr. Henceroth diagnosed Phoenix with a sprain of the left shoulder and elbow. (ECF No. 105-1, at 8.) Dr. Henceroth made recommendations to the institutional doctors that Phoenix should continue taking Tylenol and Motrin, ice the area, and that he should refrain from working. (ECF No. 105-1, at 8.) Dr. Harris "[f]ollowed Dr. Henceroth's recommendations and ordered the same." (ECF No. 105-2 ¶ 12.)

16

Phoenix saw Dr. Harris again on May 27, 2021, for elbow and shoulder pain. (ECF No. 105-1, at 8.) Dr. Harris noted that Phoenix was having numbness in his left arm and shoulder and that he was wearing a sling. (ECF No. 105-1, at 8.) Dr. Harris referred Phoenix back to Dr. Henceroth. (ECF No. 105-1, at 8.)

Phoenix saw Dr. Henceroth on June 2, 2021, for a follow-up appointment. (ECF No. 105-1, at 48.) Because Phoenix's symptoms had not improved with the initial conservative treatment that Dr. Henceroth prescribed, Dr. Henceroth determined that additional measures needed to be taken, including that Phoenix should not work. (ECF No. 105-1, at 48.) Dr. Henceroth recommended that Phoenix continue to use a sling and to have an MRI of his left shoulder and left elbow to rule out a rupture of his left biceps tendon. (ECF No. 105-1, at 48.)

## C. Phoenix's Appointments with an Outside Specialist

The following day, June 3, 2021, Phoenix saw an outside orthopedic surgeon, Dr. Vince Dalton, at Ortho Virginia, for "[p]ain of the [l]eft [s]houlder." (ECF No. 105-1, at 46.) Dr. Dalton noted that Phoenix indicated that "he also felt a pop in the elbow recently while lifting weights a couple of weeks ago." (ECF No. 105-1, at 46.) Dr. Dalton noted that it was a "[v]ery difficult exam. Patient seems to be having pain out of proportion to clinical findings. Seems to have full range of motion of the elbow, but resists motion." (ECF No. 105-1, at 46.) Dr. Dalton could "not rule out a partial tear," of the biceps tendon despite it being palpable, so he ordered an "MRI elbow left without contrast," and provided Phoenix with a referral for an MRI for his left elbow only.[16] (ECF No. 105-1, at 46–47.) In his "Plan," Dr. Dalton again noted that Phoenix had a "confusing history," and that "[h]is pain is out of proportion," and that his "elbow appears to be the major source of his pain today," despite being referred for his shoulder. (ECF No. 105-

---

[16] Phoenix contends that Dr. Dalton recommended an MRI of his elbow and shoulder. (ECF No. 122-1, at 52.) The uncontroverted record establishes that he did not.

17

1, at 47.) Dr. Dalton noted that Phoenix was "wearing a left arm sling for assistance." (ECF No. 105-1, at 46.)

### D. The MRI

On June 16, 2021, at the recommendation of Dr. Henceroth and Dr. Dalton, Dr. Harris ordered Phoenix to undergo an MRI of his elbow only. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 13.) Phoenix was scheduled for an MRI of the left elbow on June 30, 2021, but that appointment had to be rescheduled because Phoenix had a conflicting court date. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 13.)

Dr. Sharma is an internal medicine doctor and was a primary care physician at DCC until June 22, 2022. (ECF No. 105-3 ¶¶ 2–3.) Dr. Sharma also saw Phoenix for a myriad of medical issues. (ECF No. 105-3 ¶ 8.) Dr. Sharma's first interaction with Phoenix for his left elbow complaints was on August 3, 2021. (ECF No. 105-3 ¶ 9.) On August 3, 2021, after meeting with Phoenix to review a variety of health issues, Dr. Sharma requested an expedited referral for Phoenix to undergo an MRI of his left elbow to evaluate for a biceps tendon rupture. (ECF No. 105-1, at 13; ECF No. 105-3 ¶ 9.) The MRI was rescheduled for August 30, 2021, and Phoenix had an MRI on that date that showed a partial biceps tear. (ECF No. 105-1, at 72–73.)

On September 1, 2021, Dr. Sharma discussed the MRI results with Phoenix and ordered a referral appointment to Dr. Henceroth. (ECF No. 105-3 ¶ 9.) On September 14, 2021, Dr. Harris also reviewed the MRI results with Phoenix and referred Phoenix to Dr. Henceroth. (ECF No. 105-2 ¶ 12.)

### E. Phoenix's Follow-up Appointments with Dr. Henceroth and Further Care

Dr. Henceroth saw Phoenix on September 30, 2021. (ECF No. 105-3 ¶ 9.) Dr. Henceroth recommended that Phoenix be provided with an elbow sleeve and advised him to follow up as needed. (ECF No. 105-3 ¶ 9.) Dr. Sharma ordered the elbow sleeve for Phoenix

18

that day. (ECF No. 105-3 ¶ 23; ECF No. 105-1 ¶ 11.) On October 1, 2021, Dr. Sharma, amongst other things, prescribed Phoenix Tylenol for ninety days and noted that Excedrin was contraindicated because of GI bleeding. (ECF No. 105-1, at 11.)

On November 19, 2021, Dr. Sharma saw Phoenix for continued complaints of left arm pain. (ECF No. 105-3 ¶ 9.) Dr. Sharma and Dr. Harris referred Phoenix for a follow-up appointment with Dr. Henceroth regarding the partial left biceps tendon tear. (ECF No. 105-2 ¶ 12.) On December 2, 2021, Phoenix saw Dr. Henceroth who recommended that Phoenix continue conservative management of the tear. (ECF No. 105-2 ¶ 12; ECF No. 105-3 ¶ 9.) That same day, Dr. Sharma reviewed the note from Dr. Henceroth and noted his recommendation in Phoenix's chart. (ECF No. 105-1, at 15.)

On February 3, 2022, Phoenix complained of shoulder pain, and the nurse noted that he currently had an order for Tylenol, that he should return if the condition worsened, and that he needed education including that he should not do heavy lifting, he should rest and use a warm compress. (ECF No. 122-2, at 83.) On February 16, 2022, Dr. Sharma mistakenly ordered x-rays of his right shoulder, instead of his left shoulder, and Phoenix had those x-rays on February 18, 2022. (ECF No. 122-2, at 85–86.)

On February 19, 2022, Phoenix requested additional pain control for another ten days amongst other unrelated requests. (ECF No. 105-1, at 17.) Dr. Sharma prescribed Phoenix 800mg of ibuprofen for ten days. (ECF No. 105-1, at 17.)

## F. **Phoenix's Second Referral to Ortho Virginia**

In April of 2022, Dr. Harris referred Phoenix back to Ortho Virginia for left distal biceps tendon repair because Phoenix reported that he had not seen improvement with conservative management. (ECF No. 105-2 ¶ 12.) On April 15, 2022, Phoenix saw a physician's assistant ("PA") at Ortho Virginia for pain in his left elbow. (ECF No. 105-1, at 55.) The PA discussed

19

treatments with Phoenix for the partial tear of the biceps tendon, "including conservative vs. surgical management." (ECF No. 105-1, at 56.) The PA noted that because "he has not seen relief with conservative management, [Phoenix] would like to proceed with surgical intervention," and noted that Phoenix should follow up with the surgeon. (ECF No. 105-1, at 56.) Phoenix was also diagnosed with olecranon bursitis of the left elbow and the PA "recommended minimizing weight bearing on the elbow and the effusion should resolve." (ECF No. 105-1, at 56.) On April 28, 2022, Phoenix had surgery for left biceps repair. (ECF No. 105-2 ¶ 12.)

## G. Phoenix's Post-Operative Care and Physical Therapy

On May 16, 2022, Phoenix had a post-operative follow-up appointment at VCU Orthopedics. (ECF No. 105-1, at 54; ECF No. 105-3 ¶ 9.) The physician noted that Phoenix's wound had healed, but that he would need to wear a splint at all times, and could only remove it once a day for physical therapy, and should use a sling as needed. (ECF No. 105-1, at 54.) The physician indicated that Phoenix should not lift weights but that he could do physical therapy exercises. (ECF No. 105-1, at 54.) Dr. Harris and Dr. Sharma referred Phoenix for physical therapy at the recommendation of VCU Orthopedics. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 38.)

On May 24, 2022, Phoenix saw a PA at Ortho Virginia for a post-operative follow-up appointment. (ECF No. 105-1, at 49.) Phoenix reported no pain and had full elbow range of motion. (ECF No. 105-1, at 49.) The PA recommended that Phoenix wear an elbow splint for three weeks, to limit elbow extension for three weeks, and to follow up in six weeks for a repeat evaluation. (ECF No. 105-1, at 50.)

On May 26, 2022, Phoenix had his physical therapy evaluation. (ECF No. 105-1, at 62–63.) In that initial assessment, the therapist noted that she would contact the orthopedist "to

request a surgeon-specific protocol," that he had "[e]xcellent" rehabilitation potential, and that she initially recommended therapy one to two times a week for four weeks. (ECF No. 105-1, at 63.) During a May 27, 2022 therapy session, Phoenix told the therapist that "everything is going good" and the "only issue[] is [with] push-ups." (ECF No. 105-1, at 61.)

On June 14, 2022, APRN Marinos reviewed the physical therapist's notes and ordered continued treatment and placed a referral for Phoenix to have a routine follow-up appointment with VCU Orthopedics for his biceps repair. (ECF No. 105-4, at 2.) Between June 14, 2022, and August 9, 2022, APRN Marinos saw Phoenix several times for issues unrelated to his elbow or shoulder including for headaches, to prescribe antibiotics, and for his back including noting "[a]waiting a lumbar CT scan . . . ENT." (ECF No. 105-4, at 2.)

June 22, 2022 was Dr. Sharma's last day working at DCC. (ECF No. 105-3 ¶ 9.) He had no further interactions with Phoenix. (ECF No. 105-3 ¶¶ 3, 12.)

On June 27, 2022, Dr. Harris referred Phoenix for physical therapy re-evaluation for the left biceps tendon repair. (ECF No. 105-2 ¶ 12.) Phoenix no longer reported pain and his symptoms had improved. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 60.) The therapist recommended that Phoenix continue physical therapy up to three times a week for four weeks. (ECF No. 105-1, at 60.)

During a July 19, 2022, physical therapy session, Phoenix informed that therapist that his "workouts have been going well." (ECF No. 105-1, at 78.) On July 25, 2022, the physical therapist recommended that Phoenix be discharged from physical therapy because he had met all goals, regained strength, and his range of motion in all planes. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 66–67.) The therapist also noted that Phoenix had "been cleared by [the] surgeon to resume previous workout routine." (ECF No. 105-1, at 67.)

21

On August 23, 2022, Phoenix saw APRN Marinos and APRN Marinos noted that "L elbow pain reported but not primary issue on this date. Notes MRI was done and ENT referral complete." (ECF No. 105-4, at 3.) Between August 23, 2022, and October 5, 2022, Phoenix saw APRN Marinos for issues unrelated to his elbow or shoulder, including dietary and skin concerns. (ECF No. 105-4, at 3.)

On October 18, 2022, Phoenix saw APRN Marinos for a variety of complaints including left arm pain. (ECF No. 105-4, at 3.) Relevant here, APRN Marinos noted that, at a prior visit, Phoenix had minimal pain and had regained most of his strength. (ECF No. 105-4, at 3.) Nevertheless, APRN Marinos requested that Phoenix be referred to the orthopedist for arm or left shoulder pain, and on October 20, 2022, Dr. Harris approved the referral. (ECF No. 105-4, at 3; ECF No. 105-2 ¶ 12.) That same day, APRN Marinos conducted a comprehensive chart review with the Health Services Administrator, and he noted that Phoenix had leg numbness, left arm pain, had recently had an audiology exam, had foot and ankle pain, wanted special boots, wanted an increase in Ensure, and wanted Tylenol for pain. (ECF No. 105-1, at 22.) Phoenix was prescribed 500 mg of Tylenol for thirty days. (ECF No. 105-1, at 22.)

On November 8, 2022, APRN Marinos noted that he discussed with Phoenix that he was "awaiting results from the CT L-spine and C-spine." (ECF No. 105-4, at 4.)

### H. **Phoenix's Referral for Shoulder Pain**

On November 9, 2022, Dr. Henceroth saw Phoenix for complaints of shoulder pain. (ECF No. 105-2 ¶ 12.) Phoenix showed no neurological defects when Dr. Henceroth conducted a physical examination, and Dr. Henceroth recommended that Phoenix remain under observation and follow-up as needed. (ECF No. 105-2 ¶ 12; ECF No. 105-4, at 3.)

## I. Medical Records Omitted by Defendants

Defendants provided records showing that between November 9, 2022, and February 2023, APRN Marinos noted that Phoenix had an MRI for his lower back pain and was referred to neurosurgery, had new ankle boots created by an outside provider, complained of ankle pain, complained that he had MRSA, and complained that he had hemorrhoids, and a hernia. (ECF No. 105-4, at 4–5.) However, Phoenix provided additional medical records from after this period that shows that while he complained about shoulder pain, it was secondary to many other ailments. The Court includes information from those records that bear on his shoulder complaints for the remaining period of time that he was housed at DCC.

On November 22, 2022, Phoenix complained that his Motrin and Excedrin had expired for headaches and his arm, so the nurse ordered him Tylenol. (ECF No. 122-2, at 39.) On January 5, 2023, a nurse noted that "[f]or neck, back, and shoulder complaints- inmate has been referred to neurosurgery." (ECF No. 122-2, at 41.) On March 16 and 21, 2023, Phoenix saw a nurse for headaches, nerve pain in his leg, left arm nerve pain, and red lesions on his scalp. (ECF No. 122-2, at 48–49.) The nurse noted that Motrin was prescribed for his complaints of pain and that he was awaiting a neurology consultation. (ECF No. 122-2, at 48.) On May 5, 2023, Phoenix saw a nurse at a General Sick Call and complained about a myriad of issues and the nurse noted a need for a neurology referral, an orthopedist offsite referral for arm, shoulder, and foot nerve pain, foot hardware issues, an ankle injury causing nerve pain, headaches, pain in his extremities, and photosensitivity. (ECF No. 122-2, at 5.) Similarly, on May 11, 2023, Phoenix was seen for an evaluation of his ankle pain and his request for an orthopedist appointment for his ankle. (ECF No. 122-2, at 6.) During that same appointment, Phoenix noted that he had arm numbness and pain in his shoulder "when throwing ball playing softball." (ECF No. 122-2, at 6.)

23

## J. **Final Referrals for Shoulder Pain**

On August 7, 2023, Phoenix saw Nurse Practitioner ("NP") Keri Silvis-Root for his complaints of asthma, bilateral shoulder pain, and a lump in his groin. (ECF No. 105-1, at 24; ECF No. 122-2, at 7.) NP Silvis-Root noted that Phoenix should be referred for an orthopedic evaluation. (ECF No. 105-1, at 24.)[17]

On October 16, 2023, Phoenix saw Dr. Dr. Henceroth for his left shoulder pain. (ECF 105-2 ¶ 12; ECF No. 105-1, at 35.) Based on Phoenix's continued complaints and a physical exam, Dr. Henceroth referred Phoenix for x-ray imaging of his shoulder and a referral for a physical therapy evaluation. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 35.) Dr. Henceroth requested that Phoenix follow-up with him in approximately one month. (ECF No. 105-1, at 35.) Based on Dr. Henceroth's recommendations, Dr. Harris ordered an x-ray of Phoenix's left shoulder, as well as a physical therapy evaluation, and for Phoenix to return to Dr. Henceroth in one month. (ECF No. 105-1, at 36.). On October 18, 2023, Dr. Harris referred Phoenix for an orthopedic evaluation of his shoulder. (ECF No. 105-1, at 34.) On October 19, 2023, Phoenix was scheduled for a physical therapy evaluation. (ECF No. 105-2 ¶ 12.) Phoenix missed the physical therapy evaluation because of transportation issues. (ECF No. 105-2 ¶ 12.) On October 18, 2023, Phoenix saw Dr. Greer for neck pain.[18] (ECF No. 122-2, at 12.) Amongst other

---

[17] On September 27, 2023, a nurse noted after a General Sick Call appointment for medication renewal that Phoenix was waiting on pending appointments for "ortho, neurology and neuro surgery for neck, back, ortho for arms and shoulders, ENT for hearing tests." (ECF No. 122-2, at 9.)

[18] According to Phoenix, on October 18, 2023, Phoenix had an outside specialist appointment with VCU neurosurgeon Dr. Greer who ordered Phoenix to see VCU orthopedics. (ECF No. 23 ¶ 23.) Between October 18, 2023, and October 27, 2023, Phoenix had an x-ray of his shoulder, and on October 27, 2023, Dr. Trogoski ordered Phoenix to be seen by VCU orthopedics. (ECF No. 23 ¶ 24.)

unrelated neurological issues, Dr. Greer noted that Phoenix had left shoulder impingement and recommended that Phoenix should have an orthopedist consultation. (ECF No. 122-2, at 12.)

On October 24, 2023, Dr. Harris referred Phoenix for x-ray imaging of his left shoulder. (ECF No. 105-2 ¶ 12.) The x-ray imaging "revealed no acute abnormality and inferior humeral subluxation on the internal rotation view." (ECF No. 105-2 ¶ 12.) On October 27, 2023, Phoenix saw a nurse to discuss medication renewals, joint pain, and constipation. (ECF No. 122-1, at 16.) Amongst notes to schedule a colonoscopy for GI bleed, consult with a nutrition over his diet, to discuss plans for his lumbar radiculopathy, and to renew medications for neuropathy, the nurse made a note to check on an orthopedist consult for his left shoulder impingement. (ECF No. 122-2, at 16.)

On December 5, 2023, Phoenix saw an NP at VCU Ortho for an evaluation of his left shoulder pain. (ECF 105-1, at 26.) The NP diagnosed Phoenix with chronic left shoulder pain with a suspected rotator cuff and/or labrum tear.[19] (ECF No. 105-1, at 26.) The NP recommended that Phoenix have an MRI of his left shoulder and to wear a sling for comfort. (ECF No. 105-1, at 26.) She further recommended that Phoenix should not lift, push, or pull, and that he should take "Tylenol and/or NSAIDs for pain." (ECF No. 105-1, at 26.) The NP reported that Phoenix was already taking 1000 mg of Tylenol three times a day, and Excedrin Migraine. (ECF No. 105-1, at 28.)

On December 19, 2023, Phoenix had an MRI of his left shoulder. (ECF No. 105-1, at 69.) The MRI revealed "[m]ild central cuff tendinopathy without [a] rotator cuff tear, [m]ild bursitis, [m]ild posterior subluxation of the humerus suggestive of underlying posterior

---

[19] During his appointment, Phoenix also complained that he had Sjogren's syndrome and noted he was seeing neurosurgery for his neck, shoulder, and back. (ECF No. 105-1, at 26.)

instability, [and a] [m]oderate chondrosis posterior glenoid articular surface with probable posterior labral tear." (ECF No. 105-1, at 69–70 (numbering omitted).)

On January 19, 2024, Phoenix was transferred to St. Brides Correctional Center, and the Defendants had no further involvement with Phoenix's medical care. (ECF No. 105-2 ¶¶ 12, 16.)[20]

## K. RN Powell was Not Involved in Phoenix's Care

Dr. Harris reviewed Phoenix's medical records and avers that RN Powell was not clinically involved with Phoenix's complaints about his left elbow and shoulder. (ECF No. 105-2 ¶ 9.) Rather, "[h]er involvement was limited to being present at one multidisciplinary team meeting where a comprehensive discussion about all his medical issues took place." (ECF No. 105-2 ¶ 9.) Moreover, as a Registered Nurse, she lacked authority to order any treatment for Phoenix's complaints. (ECF No. 105-2 ¶ 9.)

## VI. Analysis

## A. Eighth Amendment Principles

To survive summary judgment, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A medical need is "serious" if it "has been diagnosed by a

---

[20] The Court notes that after his transfer, on February 21, 2024, Phoenix alleges that he returned to VCU for an MRI follow up and the doctor recommended full left shoulder replacement surgery. (ECF No. 23 ¶ 27.) On April 12, 2024, Phoenix alleges that he had "a full shoulder replacement surgery." (ECF No. 23 ¶ 28.)

physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S. at 105–06).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2). "Importantly, a prison official 'who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he or she] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (alterations in original) (quoting *Farmer*, 511 U.S. at 844).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Thus, "[t]he Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves 'the question whether additional diagnostic techniques or forms of treatment [are] indicated.'" *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 107).

## B. Dr. Harris and Dr. Sharma

In Claim Three, Phoenix contends that Dr. Harris and Dr. Sharma "are and remain deliberately indifferent to my serious medical shoulder and elbow conditions through their actions of not providing timely access to medical testing, timely access to surgical corrections, [and] failing to provide [the] proper standard of medical care" in violation of the Eighth Amendment. (ECF No. 23, at 18.) However, Phoenix fails to demonstrate that Dr. Harris and

28

Dr. Sharma were deliberately indifferent to Phoenix's serious medical needs. Neither doctor ignored Phoenix's complaints and instead, they repeatedly provided him with pain medications when requested, and referred him to outside specialists, for imaging, surgery, and physical therapy treatment. Here, Phoenix disagrees with the timing and course of care he received, both of which fail to support a claim of deliberate indifference.

As a preliminary matter, Phoenix's elbow injury and biceps tear, and shoulder injury are certainly serious medical needs. Nevertheless, the record makes clear that neither doctor acted with deliberate indifference to Phoenix's complaints or his injuries. "Once prison officials are aware of a serious medical need, they need only to respond reasonably to the risk." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). The record reflects that Dr. Harris and Dr. Sharma provided a reasonable response to Phoenix's complaints. When Dr. Harris first saw Phoenix on January 8, 2021, for his complaints of elbow pain, approximately a month after the initial injury, he advised Phoenix not to exercise for two weeks and to continue taking Motrin. (ECF No. 105-2 ¶ 12.) On February 3, 2021, Phoenix reported that Motrin was not relieving his discomfort. (ECF No. 105-1, at 6.) In response to his complaints of pain, Dr. Harris ordered Phoenix to take two 325 mg doses of Tylenol twice daily as needed for his "headache, neck and/or back complaints." (ECF No. 105-1, at 6.) Phoenix did not complain of elbow pain again for several months.

On May 20, 2021, Phoenix further injured himself and he reported that "something snapped working out of yard this morning," with regard to his left arm. (ECF No. 105-1, at 9.) That same day, Phoenix saw Dr. Harris in the clinic for elbow pain and Phoenix reported "he was pumping weights (35 lbs) with his left arm using a dumbbell when he popped something." (ECF No. 105-1, at 9.) Dr. Harris ordered a sling for Phoenix's arm, prescribed 600mg of

29

ibuprofen three times daily for the ten days and placed an "urgent" referral for Phoenix to see the orthopedist. (ECF No. 105-2 ¶ 12.) Dr. Harris also ordered an x-ray. (ECF No. 105-1, at 9, 71.) On May 21, 2021, Phoenix saw the orthopedist Dr. Henceroth who diagnosed the injury as a sprain of the left elbow and shoulder, and he recommended that Phoenix continue to take Motrin and Tylenol, to ice the area, and that Phoenix should refrain from working. (ECF No. 105-2 ¶ 12.) Dr. Harris "[f]ollowed Dr. Henceroth's recommendations and ordered the same." (ECF No. 105-2 ¶ 12.) On May 27, 2021, because Phoenix's symptoms had not improved, Dr. Harris referred Phoenix back to Dr. Henceroth. (ECF No. 105-1, at 8.) Dr. Henceroth saw Phoenix on June 2, 2021, and determined that additional measures needed to be taken and recommended that Phoenix continue to use a sling and to have an MRI of his left shoulder and left elbow to rule out a rupture of his left biceps tendon. (ECF No. 105-2 ¶ 12.)

The following day, Phoenix was sent to a Ortho Virginia, to an orthopedist, Dr. Dalton, who questioned Phoenix's history as "confusing," and noted that "[h]is pain is out of proportion" to clinical findings, and that his "elbow appears to be the major source of his pain today," despite being referred for his shoulder. (ECF No. 105-1, at 46–47.) Because Dr. Dalton could "not rule out a partial tear," of the biceps tendon despite it being palpable, he ordered an "MRI elbow left without contrast," and provided Phoenix with a referral for an MRI for his left elbow only. (ECF No. 105-1, at 46–47.) Clearly, the record shows that two specialists suspected the same injury.

On June 16, 2021, on the recommendation of Dr. Henceroth and Dr. Dalton, Dr. Harris ordered Phoenix to undergo an MRI of his elbow only. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 13.)[21] Phoenix was scheduled for an MRI of the left elbow on June 30, 2021, but that

---

[21] Phoenix insists that Dr. Harris cancelled the MRI of his shoulder. (ECF No. 122-1, at 36.) Dr. Harris did not cancel the MRI for Phoenix's shoulder, instead he only ordered the MRI of his elbow as recommended by Dr. Dalton.

30

appointment had to be rescheduled because Phoenix had a conflicting court date. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 13.) Phoenix faults Dr. Harris for not ordering the MRI in a timely manner. However, Dr. Harris did not see Phoenix again for his elbow until September 14, 2021, for a review of the MRI. (ECF No. 105-2 ¶ 12.)[22] Instead, on his first visit with Phoenix, on August 3, 2021, Dr. Sharma noted that Phoenix had not yet had the MRI of his left elbow that had been cancelled. In response, Dr. Sharma referred Phoenix for an expedited MRI of his elbow, and that occurred on August 30, 2021. (ECF No. 105-1, at 13, 72–73; ECF No. 105-3 ¶ 9.)

Both Dr. Sharma and Dr. Harris then reviewed the MRI with Phoenix and referred Phoenix for a follow-up appointment with Dr. Henceroth. (ECF No. 105-2 ¶ 12.) On September 30, 2021, Dr. Henceroth recommended that Phoenix use an elbow sleeve and follow up as needed, and Dr. Sharma ordered the sleeve. (ECF No. 105 ¶ 2; ECF No. 105-3 ¶ 9.) On November 19, 2021, when Phoenix continued to complain of pain, Dr. Sharma referred Phoenix back to Dr. Henceroth who recommended further conservative treatment and observation.

Phoenix complained of shoulder pain twice in February of 2022. Although he was already prescribed Tylenol, the nurse noted that he should return if the condition worsened, and that he needed education including that he should not do heavy lifting, he should rest and use a warm compress. (ECF No. 122-2, at 83.) Phoenix also requested additional pain control for

---

[22] To the extent that Phoenix faults Dr. Harris for not reviewing the records and ensuring that his MRI was rescheduled prior to his visit with Dr. Sharma, he shows no harm from the delay. "Where a deliberate indifference claim is predicated on a delay in medical care, . . . there is no Eighth Amendment violation unless 'the delay results in some substantial harm to the patient.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (quoting *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. Feb. 9, 2012) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Phoenix has adduced no evidence that demonstrates the delay in receipt of the elbow MRI, standing alone, caused him substantial harm.

another ten days amongst other unrelated requests and Dr. Sharma prescribed Phoenix 800 mg of ibuprofen for ten days. (ECF No. 105-1, at 17.)[23]

In April of 2022, Phoenix was once again under the care of Dr. Harris and did not see Dr. Sharma again for his elbow.

On April 8, 2022, Dr. Harris referred Phoenix back to Ortho Virginia for left distal biceps tendon repair because Phoenix reported that he had not seen improvement with conservative management. (ECF No. 105-2 ¶ 12.) On April 15, 2022, the PA discussed treatments with Phoenix for the partial tear of the biceps tendon, "including conservative vs. surgical management." (ECF No. 105-1, at 56.) The PA noted that because "he has not seen relief with conservative management, [Phoenix] would like to proceed with surgical intervention." (ECF No. 105-1, at 56.) On April 28, 2022, Phoenix had surgery for left biceps repair. (ECF No. 105-2 ¶ 12.) On April 29, 2022, Phoenix requested additional pain medication, and he was prescribed 800 mg of Ibuprofen twice daily for the days. (ECF No. 105-1, at 299.)

After his surgery, Dr. Harris referred Phoenix for follow-up appointments with outside orthopedists and nearly two months of physical therapy. Phoenix continued to improve, and by June 27, 2022, he noted no pain and that his symptoms had improved. (ECF No. 105-2 ¶ 12.) By July 25, 2022, the physical therapist recommended that Phoenix be discharged because he had met all goals, had been authorized by the surgeon to work out again, and Phoenix reported to her that his "workouts have been going well." (ECF No. 105-1, at 66–67, 78.) Accordingly, Dr.

---

[23] Although Dr. Sharma mistakenly ordered x-rays of Phoenix's right shoulder, instead of his left shoulder (ECF No. 122-2, at 85–86), at most, this could amount to mere negligence, which fails to implicate the Eighth Amendment. *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citations omitted).

32

Harris could reasonably rely on Phoenix's own statements to the outside providers and based on their expertise, that Phoenix had recovered from his injury.

Phoenix fails to establish that Dr. Harris or Dr. Sharma disregarded an excessive risk to Phoenix's health or safety necessary to show a constitutional violation. In response to Phoenix complaints of lack of improvement and ongoing pain, Dr. Harris and Dr. Sharma provided continuous care, referred Phoenix to many specialists, and followed their recommendations for treatment and testing. At the base of his claims, Phoenix apparently wanted treatment on a more expedited basis. However, the law plainly provides that Phoenix was not entitled to the medical care of his choosing. *Wright*, 766 F.2d at 849 (citations omitted); *Bowring*, 551 F.2d at 48 ("disavow[in]g any attempt [of the Court] to second-guess the propriety or adequacy of a particular course of treatment"). Phoenix fails to show that Dr. Harris or Dr. Sharma was deliberately indifferent to his elbow injury.

With respect to his shoulder injury, Phoenix fails to demonstrate that Dr. Harris was deliberately indifferent to Phoenix's serious medical needs.[24] Phoenix began to complain about his shoulder on October 18, 2022.[25] Dr. Harris quickly referred Phoenix to Dr. Henceroth, who

---

[24] Dr. Sharma left DCC on June 22, 2022, and was not involved with Phoenix's medical care when he began to complain about his shoulder.

[25] Phoenix's statements about whether the shoulder injury was new or was part of the original injury is inconsistent. In his Particularized Complaint, he states that "[a]fter the surgery, [he] underwent therapy and developed nerve issues in his arm . . . ." (ECF No. 23, at 12.) Phoenix also insists the shoulder injury was not new but was part of his original injury, and that his shoulder replacement was "due to 4 years with no treatment." (ECF No. 122-1, at 24, 54.) That he received no treatment is clearly belied by the record. Phoenix saw many specialists and received treatment, surgery, and physical therapy for his torn biceps tendon, and Defendants, and the specialists alike, clearly believed this treatment would resolve his pain.

Phoenix also reported no pain as of July of 2022 and was cleared by the surgeon and the physical therapist to exercise again normally. To the extent that any shoulder pain lingered after his biceps tendon repair and physical therapy, [i]t would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain." *Snipes v. DeTella*, 95 F.3d

33

saw him on November 9, 2022. (ECF No. 105-2 ¶ 12.) Phoenix showed no neurological defects when Dr. Henceroth conducted a physical examination, and Dr. Henceroth recommended that Phoenix remain under observation and follow-up as needed. (ECF No. 105-2 ¶ 12; ECF No. 105-4, at 3.) Once again, Dr. Harris responded promptly to Phoenix's complaint and could rely on the specialist's opinion and prescribed treatment. Between November of 2022 and August of 2023, Phoenix periodically complained about his arm numbness and shoulder pain and stiffness to other medical staff; however, his reports were secondary to his complaints about a litany of other ailments. Phoenix noted to medical staff on May 5, 2023, that his arm and shoulder hurt him when he was throwing the ball playing softball. Clearly, Phoenix's shoulder pain was not as severe or inhibitive at that juncture as he wants the Court now to believe. Dr. Harris could reasonably believe that an inmate who could play softball was not suffering from such a sufficiently serious shoulder injury that it required immediate treatment beyond the orthopedist's recommendations.

---

586, 592 (7th Cir. 1996). The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Id.* So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown v. Harris*, 240 F.3d 383, 389–90 (4th Cir. 2001). Moreover, once Phoenix complained that he was experiencing pain in his shoulder, Dr. Harris referred him back to a specialist and followed the specialist's recommendations.

Phoenix also believes that he should have had an MRI for his shoulder at the same time as his elbow, and according to him, this would have shown the exact same thing that the MRI showed four years later. (ECF No. 122-1, at 34.) However, this is nothing more than speculation and conjecture unsupported by any evidence. Instead, it is a reasonable inference that Phoenix's condition was exacerbated by his insistence on engaging in physical activities like weightlifting and softball. And although Phoenix wanted an MRI of his shoulder at an earlier time, "[t]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray [or MRI], or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107; *see Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is a 'a classic example of a matter for medical judgment.'" (citing *Estelle*, 429 U.S. at 107)). Dr. Dalton at Ortho Virginia determined that only an MRI of the left elbow was required at that time, and based on that recommendation, Dr. Harris and Dr. Sharma ordered that specific MRI.

34

During a medical appointment on August 7, 2023, asthma, bilateral shoulder pain, and a lump in his groin were Phoenix's primary complaints, and the NP referred him for an orthopedic evaluation. (ECF No. 105-1, at 24.) On October 16, 2023, Phoenix saw Dr. Henceroth for his left shoulder pain, he referred Phoenix for x-ray imaging of his shoulder and a for a physical therapy evaluation, and Dr. Harris ordered the same. (ECF No. 105-2 ¶ 12; ECF No. 105-1, at 35–36.) On October 18, 2023, Dr. Harris referred Phoenix for an orthopedic evaluation of his shoulder. (ECF No. 105-1, at 34.)

On December 5, 2023, Phoenix saw an NP at VCU Orthopedics who diagnosed Phoenix with chronic left shoulder pain with a suspected rotator cuff and/or labrum tear. (ECF No. 105-1, at 26.) The NP recommended that Phoenix have an MRI of his left shoulder and to wear a sling for comfort. (ECF No. 105-1, at 26.) She further recommended that Phoenix should not lift, push, or pull, and that he should take "Tylenol and/or NSAIDs for pain." (ECF No. 105-1, at 26.) The NP reported that Phoenix was already taking 1000mg of Tylenol three times a day, and Excedrin Migraine. (ECF No. 105-1, at 28.)

On December 19, 2023, Phoenix had an MRI of his left shoulder. (ECF No. 105-1, at 69.) On January 19, 2024, Phoenix was transferred to St. Brides Correctional Center and Dr. Harris and APRN Marinos had no further involvement with Phoenix's case. (ECF No. 105-2 ¶¶ 12, 16.)

Although Phoenix ultimately received a total shoulder replacement after his transfer, Dr. Harris was not deliberately indifferent to Phoenix's complaints of shoulder pain. In assessing a claim of deliberate indifference, the Court must consider the totality of medical care provided, rather than simply the additional treatment the inmate was denied. *See Walkers v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (citing *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999)). When Phoenix complained of pain a few months after he concluded physical therapy, Dr. Harris

35

sent him to specialists and ordered the testing they recommended. Although Phoenix wanted an MRI faster than he received it, the timing of that test was a matter of medical judgment. *Estelle*, 429 U.S. at 107 (citation omitted). In addition, the record reflects that during this time, while Phoenix complained of shoulder pain it was secondary to other medical complaints. Phoenix also continued to participate in sports and activities that undermine his claims of serious shoulder pain. Phoenix complains of nothing more than a disagreement with Dr. Harris and the various specialists' professional medical opinion about the appropriate course of treatment and its timing, and thus, he fails to establish a cognizable constitutional claim, much less deliberate in difference. *Wright*, 766 F.2d at 849; *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (explaining that "[i]t is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment"). To the extent there were delays in scheduling appointments with specialists,

> Medical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital. Waiting is often the name of the game. And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis. It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.

*Moskos v. Hardee*, 24 F.4th 289, 297–98 (4th Cir. 2022). In the end, Phoenix puts forth no evidence from which a jury reasonably could find that Dr. Harris's or Dr. Sharma's exercise of medical judgment was "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851.[26]

---

[26] As discussed previously, Phoenix did not raise a claim that Defendants provided him with no pain management in his Particularized Complaint. However, to put this to rest, the Court briefly addresses this allegation. Phoenix claims that, "[t]hroughout this entire ordeal, the only form of pain management was Tylenol or ibuprofen at times." (ECF No. 122-1, at 37.) This clearly shows that Phoenix was provided with pain management and his claim that he was not is

In sum, Phoenix fails to demonstrate that Dr. Harris or Dr. Sharma was deliberately indifferent to his elbow or shoulder injury. Claim Three against Dr. Harris and Dr. Sharma will be DISMISSED.

### C. APRN Marinos

In Claim Three, Phoenix contends that APRN Marinos "[is] and remain[s] deliberately indifferent to my serious medical shoulder and elbow conditions through [his] actions of not providing timely access to medical testing, timely access to surgical corrections, and failing to provide the proper standard of medical care" in violation of the Eighth Amendment. (ECF No. 23, at 18.) At most, Phoenix contends that APRN Marinos "had access to my medical record and met with [him] on several occasions." (ECF No. 23, at 15.)[27] Again, Phoenix fails to demonstrate that APRN Marinos was deliberately indifferent to Phoenix's serious medical needs from his limited interactions with Phoenix about his elbow and shoulder. Between June of 2022 and November 2022 -- the only time period when APRN Marinos saw Phoenix for his elbow and shoulder complaints -- APRN Marinos placed a referral for Phoenix to have biceps tendon repair, renewed Phoenix's physical therapy prescription and then discharged him from physical therapy,

---

false. The medical record shows that he was consistently on pain medications because of his other ailments such as migraine headaches and various orthopedic issues. Because the reasonableness of any response to pain usually calls for medical judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592. At an outside medical visit, Phoenix reported taking at least 29 different medications or supplements prescribed by prison doctors for his various conditions (*see* ECF No. 105-2, at 31), and he plainly had certain restrictions on what medications were appropriate based on his conditions and other medications. For example, at one point Dr. Sharma noted that Excedrin was contraindicated due to GI bleeding. (ECF No. 105-1, at 11.) Dr. Sharma's and Dr. Harris's determinations on what pain medicines to prescribe Phoenix is the sort of medical decision that exceeds the scope of judicial review. *Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975).

[27] Phoenix did not mention any involvement of APRN Marinos in his statement of the facts in his Particularized Complaint.

noted that Phoenix reported elbow pain but that it was not his primary complaint, conducted a review of Phoenix's chart, referred Phoenix to the orthopedist, and then reviewed the orthopedists' notes and noted that he would "monitor." (ECF No. 104-2, at 2–4.) Phoenix was under the care of other medical staff during this time. Phoenix fails to demonstrate that APRN Marinos ignored Phoenix's complaints and instead, APRN Marinos repeatedly referred him to outside specialists and for physical therapy treatment.

Phoenix -- once again -- clearly disagrees with the timing and the course of care he received, both of which fail to support a claim of deliberate indifference. Because Phoenix fails to show that APRN Marinos was deliberately indifferent to his elbow or shoulder injury, Claim Three against APRN Marinos will be DISMISSED.

### D. Nurse Powell

The uncontroverted record demonstrates that Nurse Powell was not involved in a clinical setting for Phoenix's elbow or shoulder injury. Nurse Powell attended one meeting with medical staff about Phoenix's copious medical issues. (ECF No. 105-2 ¶ 9.) However, Nurse Powell was not able to diagnose ailments or order diagnostic studies, medications, or make referrals to specialists. (ECF No. 105-2 ¶ 9.) Nurse Powell was also entitled to rely upon the medical judgment of the many doctors with respect to the proper course of treatment for Phoenix's injury. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 539 (3d Cir. 2017) (concluding nurse acted with no deliberate indifference by following doctor's orders); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (citation omitted) (observing that "a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, [but] that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient"). Because Phoenix fails to demonstrate that Nurse Powell was deliberately indifferent to his elbow and shoulder injury, Claim Three against her will be DISMISSED.

38

## VII.  Conclusion

Phoenix's Motion for Leave to File Response to Summary Judgment (ECF No. 120) will be GRANTED.  The Motion for Summary Judgment (ECF No. 104) will be GRANTED.  Claim Three will be DISMISSED.  The action will be DISMISSED.

An appropriate Final Order shall issue.

Date: 4/7/26
Richmond, Virginia

/s/
M. Hannah Lauck
Chief United States District Judge

39